Richard D. McCune [Bar No. 132124]
rdm@mccunelawgroup.com
Michele M. Vercoski [Bar No. 244010]
mmv@mccunelawgroup.com
Yasmin N. Younessi [Bar No. 331327]
ynv@mccunelawgroup.com
**MCCUNE LAW GROUP, APC**
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert R. Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Jeff S. Westerman (SBN 94559)
jwesterman@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111

Interim Co-Lead Class Counsel for Plaintiffs and the Proposed Classes

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **IN RE: BOYLE HEIGHTS WAREHOUSE FIRE LITIGATION**<br><br>This Document Relates To:<br>ALL ACTIONS<br><br>RUBEN HERNANDEZ, LILIANA LOZANO, JOHN GARCIA, ANTHONY HALE, YVETTE MARTINEZ, CITLALI GUARDADO, LUIS GUARDADO, VANESSA REYES, ORTEGATI, INC, and MEXES CAFÉ, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v. | Lead Case No. 2:26-cv-07375-WLH (DMKx)<br><br>CLASS ACTION<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR:**<br>1. NEGLIGENCE;<br>2. NEGLIGENCE PER SE;<br>3. PREMISES LIABILITY;<br>4. TRESPASS;<br>5. PRIVATE NUISANCE;<br>6. PUBLIC NUISANCE;<br>7. STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY |

LINEAGE, INC.; LINEAGE LOGISTICS HOLDINGS, LLC; LINEAGE LOGISTICS PFS, LLC; LINEAGE LOGISTICS, LLC; CHILL BUILD LOS ANGELES I, LLC; LOS PALOS STREET OPERATING, LLC; ALTUS POWER, INC.; PEARCE SERVICES, LLC; NORTHERN ELECTRIC POWER TECHNOLOGY, INC.; HD HYUNDAI ENERGY SOLUTIONS AMERICA, INC.; AMPHENOL CORPORATION; and DOES 1-50, inclusive,

Defendants.

**DEMAND FOR JURY TRIAL**

Plaintiffs Ruben Hernandez, Liliana Lozano, John Garcia, Anthony Hale, Yvette Martinez, Citlali Guardado, Luis Guardado, Vanessa Reyes, Ortegati, Inc., and Mexes Café, LLC ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint against Defendants Lineage, Inc., Lineage Logistics Holdings, LLC, Lineage Logistics PFS, LLC, and Lineage Logistics, LLC (collectively, "Lineage"); Chill Build Los Angeles I, LLC ("Chill Build"); Los Palos Street Operating, LLC ("Los Palos"); Altus Power, Inc. ("Altus Power") (Los Palos and Altus Power are referred to jointly herein as "Altus"); Pearce Services, LLC ("Pearce"); Northern Electric Power Technology, Inc. ("NEP"); HD Hyundai Energy Solutions America, Inc., formerly Hyundai Energy Solutions America, Inc. ("Hyundai"); Amphenol Corporation ("Amphenol"); and Does 1 through 50, inclusive (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1. This Consolidated Class Action Complaint is filed pursuant to this Court's order consolidating the related actions arising from the June 17, 2026 fire at the Boyle Heights cold-storage warehouse facility located at 1400 South Los Palos Street, Los Angeles, California 90023 (the "Facility"), and this Court's order

appointing interim co-lead class counsel for Plaintiffs and the proposed Classes. This Consolidated Class Action Complaint is the operative pleading for these consolidated putative class actions and is brought solely on behalf of the proposed Classes; it does not supersede, replace, or assert claims on behalf of any separately filed individual, non-class action.

2. This is a class action brought on behalf of residents, property owners, and businesses who were harmed by a massive industrial fire that broke out on June 17, 2026 at the Facility (the "Fire"), a roughly 500,000-square-foot cold-storage and blast-freezing warehouse in the Boyle Heights neighborhood of Los Angeles. On June 17, 2026, as a result of the Fire, approximately 70 people were evacuated by the Los Angeles Police Department across two nearby streets. The Los Angeles Fire Department ("LAFD") issued shelter-in-place orders, first on June 17, 2026, and again on June 18, 2026, for more than 4,000 individuals in the areas surrounding the Facility.[1] The hazardous smoke and off-gassing also prompted the South Coast Air Quality Management District ("SCAQMD") to issue a Particle Pollution Advisory and Smoke Advisory, which remained in effect through June 24, 2026, as firefighters continued to battle the blaze, affecting air quality across the region. In portions of the affected region, air quality levels ranged from "unhealthy for sensitive groups" to "very unhealthy."

3. The Fire burned for approximately a week, overwhelming the Facility's structure. The Fire caused the spread of toxic smoke, ash, soot, airborne particulate matter, accelerants, and other hazardous toxins and combustion byproducts. Significant and lasting harms from the Fire unfolded in its aftermath. The impact on the Facility's storage and refrigeration functions left tens of millions of pounds of stored food to rot, which generated noxious odors and an infestation of rodents and

[1] Jonathan Lloyd and Danielle Smith, *Hourslong shelter-in-place order lifted for Boyle Heights warehouse fire*, NBC4 Los Angeles (Jun. 18, 2026), available at https://www.nbclosangeles.com/news/local/boyle-heights-fire-lineage/3905682/.

other pests that plagued the surrounding community. Fire and rotting food contaminated the air, water, and soil downwind and downstream of the Facility, including the Los Angeles River watershed.

4. The ownership and operation of the Facility, the role of each Defendant with respect to the rooftop solar array and its reconfiguration, and the origin and cause of the Fire are set forth in the Parties and Factual Background sections below. In brief, Defendant Chill Build owns the Facility; Defendant Lineage operated the Facility as tenant under a cold-storage lease; Defendants Altus Power and Los Palos owned and operated the rooftop solar array; Defendant Pearce performed the reconfiguration, testing, and commissioning work underway on the array when the Fire ignited; and Defendants NEP, Hyundai, and Amphenol designed, manufactured, or supplied components installed in the array.

5. Lineage says it only leases the roof to Altus Power and that the fire "started on the roof when the owner of the solar array, Altus Power, was doing tests."[2] Altus Power stated that "[t]he cause of the fire where our rooftop solar array is located at the Los Palos Street facility has yet to be determined."[3] .

6. Lineage's effort to distance itself from the solar array is contradicted by the investigative record and by Lineage's own allegations. According to the Los Angeles Fire Department's origin-and-cause investigation report, a Lineage employee was responsible for verifying the operational safety of the solar panels before they were placed into service.[4] In its own lawsuit against Altus and Pearce,

---

[2] *Health concerns intensify over Boyle Heights fire as LA officials say smoke will blanket city for 3 more days*, CBS News Los Angeles (updated Jun. 22, 2026), available at https://www.cbsnews.com/losangeles/news/boyle-heights-fire-health-concerns-air-quality-lineage-los-angeles/.

[3] *Los Angeles firefighters say fire at Boyle Heights cold storage facility has been knocked down*, CBS News Los Angeles (updated Jun. 25, 2026), available at https://www.cbsnews.com/losangeles/news/boyle-heights-warehouse-fire-june-24/.

[4] Los Angeles Fire Department, *Los Palos Fire Investigation Report*, LAFD Incident No. 202606171811 (Aug. 25, 2026) (the "LAFD Report").

Lineage alleges that, after an earlier 2024 fire, it directed that the solar array be shut off and refused to permit it to be re-energized until Lineage's safety concerns were addressed.[5] Yet, Lineage's employee later said they had no way to know if the required safety tests had not been done.

7. The fire released a dangerous mixture of toxic smoke, ash, soot, airborne particulate matter, accelerants, and other hazardous toxins and combustion byproducts into the surrounding community, including hydrogen fluoride, which fire officials detected and attributed to a burning lithium-ion battery, likely from a battery-operated forklift, toxic volatile organic compounds released by the combustion of the Facility's dense polyurethane foam insulation, and fine particulate matter (PM2.5) that reached "Very Unhealthy" air quality index levels across wide portions of Los Angeles County and neighboring communities, and other hazardous substances.

8. The Facility's industrial refrigeration system used large amounts of anhydrous ammonia, an extremely hazardous and toxic chemical. According to initial reports, including statements then attributed to LAFD Chief Jaime Moore, as the fire spread it reached a refrigerant line carrying anhydrous ammonia, causing several small explosions and sending a thick plume of toxic smoke into the air that could be seen for miles, and firefighters were forced to retreat from the building because of the dangers presented by the ammonia, despite wearing full breathing and firefighting protection and duct-taping areas where ammonia could contact their skin.[6] The Los Angeles Fire Department initially reported that ammonia had leaked during the fire. Lineage insists there was no ammonia leak, asserting that the ammonia was pumped out of the refrigeration system shortly after the fire began and before the fire reached

---

[5] Complaint, *Lineage Logistics PFS, LLC, et al. v. Altus Power, Inc., et al.*, No. 26STCV28797 (L.A. Super. Ct. filed Sept. 10, 2026) ("Lineage Compl.").

[6] Jonathan Lloyd and Danielle Smith, *Hourslong shelter-in-place order lifted for Boyle Heights warehouse fire*, NBC4 LOS ANGELES (Jun. 18, 2026), available at https://www.nbclosangeles.com/news/local/boyle-heights-fire-lineage/3905682/.

that system, but Lineage has declined to disclose the information needed to confirm that account, including the quantity of ammonia on site when the Fire ignited, the quantity recovered, and when and how it was removed. The Fire damaged at least one of the Facility's ammonia pumps, visibly darkening the white pump as though it had been exposed to flame.

9. News reports indicate that air quality sensors operated by the South Coast Air Quality Management District located at Eastman Avenue Elementary School and Robert Louis Stevenson Middle School, both of which are less than a mile from the warehouse, were not equipped to measure ammonia until July 23 but, since then, "Ammonia levels have spiked repeatedly," including a "spike at the beginning of August."[7] In addition to its use as a refrigerant at the Facility, Ammonia is generated by decomposing food, so such readings may reflect ammonia emanating from the Facility from its refrigeration system or from the tens of millions of pounds of food left to rot there as a result of the Fire.

10. The City of Los Angeles and the State of California each declared a state of emergency in response to the fire; the South Coast Air Quality Management District ("SCAQMD") issued particle-pollution advisories, extended repeatedly as the fire continued, covering central Los Angeles County, the San Gabriel Valley, the East San Fernando Valley, and the Northwest San Bernardino Valley; and local authorities ordered residents in the Facility's immediate vicinity to shelter in place. Thousands of residents reported throat and eye irritation, headaches, and difficulty breathing, and numerous businesses were forced to suspend operations, some for months or longer.

11. Critically, a prior fire involving the same rooftop solar installation occurred in 2024, placing every Defendant on actual notice of the risk of a fire at this

[7] Lucas Brady Woods, *What air quality sensors around Boyle Heights warehouse are telling us*, LAIST (Aug. 12, 2026), https://laist.com/news/climate-environment/air-quality-boyle-heights-warehouse-explained.

site, with this equipment, well before June 17, 2026.

## THE PARTIES

**Plaintiffs**

12. Plaintiff Ruben Hernandez is a natural person who resides with his family in the East Los Angeles neighborhood of Los Angeles, California, just a few blocks east of the Facility. Beginning on June 17, 2026, Plaintiff Hernandez received mandatory shelter-in-place orders as a direct result of the Fire and the toxic smoke and substances emanating from the Facility. Plaintiff Hernandez and his family suffered damages including, but not limited to, economic loss from incident-related disruptions, inconvenience, interference with property rights, and pain and suffering from the physical impacts of the Fire. Plaintiff Hernandez brings this action individually and as a proposed representative of the Resident Class defined below. Plaintiff Hernandez is, and at all relevant times was, a citizen of the State of California.

13. Plaintiff Liliana Lozano is a natural person who resides in East Los Angeles, California, just a few blocks from the Site. Beginning on June 17, 2026, Plaintiff Lozano received mandatory shelter-in-place orders as a direct result of the Fire and the toxic smoke and substances emanating from the Facility.

14. As the Fire sent toxic smoke into the air, Plaintiff Lozano and her six-year-old daughter began to feel its physical and economic impacts. Plaintiff Lozano suffered damages including, but not limited to, economic loss from disruptions to her business, inconvenience, interference with property rights, and pain and suffering from the physical impacts of the Fire. Plaintiff Lozano also is a street vendor in the East Los Angeles and Boyle Heights neighborhoods, and she lost business income as a result of the Fire. Plaintiff Lozano brings this action individually and as a proposed representative of the Resident Class as defined below. Plaintiff Lozano is, and at all relevant times was, a citizen of the State of California.

15. Plaintiff John Garcia is a natural person who resides with his family in the East Los Angeles neighborhood of Los Angeles, California, near the Site of the

Fire. Beginning on June 17, 2026, Plaintiff Garcia received mandatory shelter-in-place orders as a result of the Fire. Plaintiff Garcia and his family suffered damages including, but not limited to, economic loss, inconvenience, interference with property rights, and pain and suffering from the physical and emotional impacts of the Fire. Plaintiff Garcia brings this action individually and as a proposed representative of the Resident Class defined below. Plaintiff Garcia is, and at all relevant times was, a citizen of the State of California.

16. Plaintiff Anthony Hale is a natural person who resides in the Boyle Heights neighborhood of Los Angeles, California, near the Site of the Fire. Beginning on June 17, 2026, Plaintiff Hale received mandatory shelter-in-place orders as a direct result of the Fire and the toxic smoke and substances emanating from the Facility. Plaintiff Hale and his family suffered damages including, but not limited to, economic loss, inconvenience, and interference with property rights from having to relocate due to the Fire, and pain and suffering from the physical impacts of the Fire. Plaintiff Hale is also a street vendor who sells goods outside his home, and he lost business income as a result of the Fire. Plaintiff Hale brings this action individually and as a proposed representative of the Resident Class as defined below. Plaintiff Hale is, and at all relevant times was, a citizen of the State of California.

17. Plaintiff Yvette Martinez is a natural person who resides with her family in the East Los Angeles neighborhood of Los Angeles, California, within the area subject to the shelter-in-place and evacuation orders issued in connection with the Fire. Beginning on June 17, 2026, Plaintiff Martinez and her household were ordered to evacuate as a direct result of the Fire and the toxic smoke and substances emanating from the Facility. For months following the Fire, Plaintiff Martinez was unable to open her windows or use her air conditioning, her children were unable to play outside, and her household suffered nausea, headaches, and pests. Plaintiff Martinez suffered damages including, but not limited to, economic loss, inconvenience, interference with property rights, and pain and suffering from the physical and

emotional impacts of the Fire. Plaintiff Martinez brings this action individually and as a proposed representative of the Resident Class defined below. Plaintiff Martinez is, and at all relevant times was, a citizen of the State of California.

18. Plaintiff Citlali Guardado is a natural person who resides with her family in the East Los Angeles neighborhood of Los Angeles, California, within the area subject to the shelter-in-place orders issued in connection with the Fire. Beginning on June 17, 2026, Plaintiff Guardado received mandatory shelter-in-place orders as a direct result of the Fire and the toxic smoke and substances emanating from the Facility. For months following the Fire, the odor was too strong for the family to be outdoors, ash and residue coated the family's home and vehicles, the household could not use its air conditioning during a heatwave without drawing the smell indoors, and the surrounding area became infested with pests. Plaintiff Guardado suffered damages including, but not limited to, economic loss, inconvenience, interference with property rights, and pain and suffering from the physical impacts of the Fire. Plaintiff Guardado brings this action individually and as a proposed representative of the Resident Class defined below. Plaintiff Guardado is, and at all relevant times was, a citizen of the State of California.

19. Plaintiff Luis Guardado is a natural person who resides with his family in the East Los Angeles neighborhood of Los Angeles, California, within the area subject to the shelter-in-place orders issued in connection with the Fire. Beginning on June 17, 2026, Plaintiff Guardado received mandatory shelter-in-place orders as a direct result of the Fire and the toxic smoke and substances emanating from the Facility. For approximately one to two months, Plaintiff Guardado and his family endured a strong odor and difficulty breathing outdoors, suffered constant headaches and nausea, and his three-year-old child became sick each time the child went outside. Plaintiff Guardado suffered damages including, but not limited to, economic loss, inconvenience, interference with property rights, and pain and suffering from the physical and emotional impacts of the Fire. Plaintiff Guardado brings this action

individually and as a proposed representative of the Resident Class defined below. Plaintiff Guardado is, and at all relevant times was, a citizen of the State of California.

20. Plaintiff Vanessa Reyes is a natural person who resides in the Boyle Heights neighborhood of Los Angeles, California, within the area subject to the shelter-in-place orders issued in connection with the Fire. Beginning on June 17, 2026, Plaintiff Reyes received mandatory shelter-in-place orders as a direct result of the Fire and the toxic smoke and substances emanating from the Facility. In the days after the Fire, a haze and ash settled over Plaintiff Reyes's residence, and she developed a persistent cough, throat irritation, and dry, itchy eyes that persisted for approximately three months, all while she was unable to leave her home and facing a scheduled surgery. Plaintiff Reyes suffered damages including, but not limited to, economic loss, inconvenience, interference with property rights, and pain and suffering from the physical impacts of the Fire. Plaintiff Reyes brings this action individually and as a proposed representative of the Resident Class defined below. Plaintiff Reyes is, and at all relevant times was, a citizen of the State of California.

21. Plaintiff Ortegati, Inc. is a business entity that owns and operates an automobile repair shop located at 1801 South Pembroke Lane, Los Angeles, California 90015, within the geographic area subject to the SCAQMD particle pollution advisory issued in connection with the Fire. As a result of the Fire, Plaintiff Ortegati, Inc.'s business premises were exposed to smoke, toxic smoke, ash, particulate matter, accelerants, and/or noxious odors or airborne matter released by the Fire; the business was forced to close due to the smoke and odor, and smoke and combustion residue were deposited on approximately ten vehicles at the shop, causing paint damage. Plaintiff Ortegati, Inc. suffered business interruption, lost revenue, closure, and related economic loss as a result of the Fire and the associated emergency-response measures. Plaintiff Ortegati, Inc. brings this action individually and as a proposed representative of the Business Class defined below. Plaintiff Ortegati, Inc. is, and at all relevant times was, a citizen of the State of California.

22. Plaintiff Mexes Café, LLC owns and operates a café located at 710 North Eastern Avenue, Los Angeles, California 90022, within the geographic area subject to the shelter-in-place order and/or the SCAQMD particle pollution advisory issued in connection with the Fire. As a result of the Fire, Mexes Café's business operations and premises were exposed to smoke, toxic smoke, ash, particulate matter, accelerants, and/or noxious odors or airborne matter released by the Fire, and suffered business interruption, lost revenue, and related economic loss over the months following the Fire. Plaintiff Mexes Café brings this action individually and as a proposed representative of the Business Class defined below.

**Defendants**

**Defendant 1: The Lineage Defendants (collectively, "Lineage")**

23. Defendant Lineage Logistics Holdings, LLC is a Delaware limited liability company with its principal place of business at 46500 Humboldt Drive, Novi, Michigan. On information and belief, Lineage is the principal operating subsidiary of Lineage OP, LP, a Maryland limited partnership, which is itself a direct subsidiary of Lineage, Inc. (NASDAQ: LINE), a Maryland corporation headquartered in Michigan. At all relevant times, Lineage occupied the Facility as tenant-operator under a lease with Chill Build, subleased the Facility's rooftop to Los Palos for installation and operation of the solar array, and operated the Facility's cold-storage and blast-freezing business and refrigeration system.

24. Defendant Lineage Logistics PFS, LLC is a Delaware limited liability company with its principal place of business in Novi, Michigan. Lineage has alleged that Lineage Logistics PFS, LLC is the landlord and sublessor under the January 2, 2020 lease governing the rooftop solar array at the Facility, holds leasehold and related property interests in the Facility, and managed and operated the day-to-day cold-storage warehouse business at the Facility. Lineage Compl. ¶ 12. The original tenant under the Facility lease with Chill Build was Preferred Freezer Services of Los Angeles Big Bear, LLC, which Lineage identifies as its predecessor. Id. ¶ 31.

25. Defendant Lineage, Inc. (NASDAQ: LINE) is a Maryland corporation with its principal place of business at 46500 Humboldt Drive, Novi, Michigan. Defendant Lineage Logistics, LLC is a Delaware limited liability company with its principal place of business in Novi, Michigan. Lineage has alleged that Lineage, Inc., Lineage Logistics Holdings, LLC, and Lineage Logistics, LLC were parties to contracts with customers using the Facility and to insurance agreements relating to operations at the Facility. Lineage Compl. ¶ 13.

26. Lineage, Inc., Lineage Logistics Holdings, LLC, Lineage Logistics PFS, LLC, and Lineage Logistics, LLC are referred to collectively herein as "Lineage." All four entities have sued Altus and Pearce together as plaintiffs in the Lineage action, alleging that each suffered losses arising from the Fire at the Facility.

**Defendant 2: Chill Build Los Angeles I, LLC ("Chill Build")**

27. Defendant Chill Build owns the real property and building located at 1400 South Los Palos Street, Los Angeles, California 90023. On information and belief, Chill Build is a Delaware limited liability company with its principal place of business at 6831 East 32nd Street, Suite 300, Indianapolis, Indiana. Chill Build has been identified by Lineage and by Los Angeles Fire Department ("LAFD") Chief Jaime Moore as the Facility's owner. Chill Build leased the Facility to Lineage's predecessor, Preferred Freezer Services of Los Angeles Big Bear, LLC, under a 29-year lease agreement dated March 16, 2017. Lineage Compl. ¶ 31.

**Defendant 3: Los Palos Street Operating, LLC ("Los Palos") and Defendant 4: Altus Power, Inc. ("Altus Power") — together, "Altus"**

28. Defendant Los Palos is a Delaware limited liability company with its principal place of business in Stamford, Connecticut. Los Palos has leased the rooftop space of the Facility since the solar array was installed, pursuant to a January 2, 2020 lease between Lineage and Los Palos for the purpose of constructing, installing, and operating the array — one of the largest rooftop solar installations in the State of California. Los Palos owns and operates the rooftop solar array across substantially

the entire roof of the Facility and was, at all relevant times, responsible for its maintenance, repair, testing, and safe operation. Los Palos engaged Pearce under a subcontract dated February 10, 2026, to perform reconfiguration, testing, and commissioning work on the array, including on June 17, 2026.

29. Defendant Altus Power is a Delaware corporation with its principal place of business in Stamford, Connecticut. On information and belief, Altus Power develops and operates commercial-scale solar assets across approximately thirty states, encompassing more than 600 individual project locations, and reported total revenue of approximately $200 million in 2024. On information and belief, Altus Power acquired Los Palos on or about February 15, 2023, and, from that time forward, Altus Power has owned and operated, and directed and controlled the operation of, the rooftop solar array installed on the Facility's roof. On information and belief, Altus is responsible for operating the solar array and for all damage caused by its operation, including the fire alleged herein. On information and belief, Altus controlled the technical execution of the "Re-Configuration Project" described below: Altus's own engineering team was responsible for preparing the work letter, specifications, and commissioning and testing procedures for that project, and for retaining Pearce to perform it.

30. On information and belief, Los Palos is, and at all relevant times was, the alter ego of Altus Power, such that the corporate separateness between them should be disregarded and Altus Power should be held jointly and severally liable for the acts and omissions of Los Palos alleged herein. On information and belief: (a) continuously since acquiring Los Palos in 2023, Altus Power has been the parent company of, and has controlled and/or operated, Los Palos as a mere instrumentality, conduit, and/or shell for Altus Power's business affairs, exercising complete control over Los Palos's business operations and decision-making; (b) the sole listed manager of Los Palos is Gregg Felton, the founder and chief executive officer of Altus Power; (c) Altus Power and Los Palos share the same registered agent in California and the

same business address, 2200 Atlantic Street, Suite 500, Stamford, Connecticut 06902; (d) Los Palos has no employees, payroll, or bank accounts independent of Altus Power; (e) individuals using Altus Power-affiliated email addresses performed extensive work on the solar array, including the repair work following the 2024 fire described below and the retention of Pearce, while Lineage and others dealing with the array were not aware of anyone using a Los Palos email address; and (f) primary decision-making and communications regarding the solar array came from Altus Power, including through Altus Power's Senior Project Manager, John Clasby, who served as Los Palos's representative under the contract retaining Pearce, and Altus Power's Chief Construction Officer, Tony Savino. Plaintiffs allege these facts on information and belief, drawn in part from positions taken by Lineage in its own related civil action against Altus Power, Los Palos, and Pearce; Plaintiffs do not represent that these facts have been judicially established.

**Defendant 5: Pearce Services, LLC ("Pearce")**

31. Defendant Pearce is a limited liability company founded in 1998 and historically headquartered in Paso Robles, California. In or about November 2025, Pearce was acquired by CBRE Group, Inc. for approximately $1.2 billion. On information and belief, Pearce is organized under the laws of Delaware and continues to maintain California offices, including at 1222 Vine Street, Paso Robles, California. CBRE Group, Inc. is a Delaware corporation with its principal executive offices in Dallas, Texas. Pearce provides infrastructure services for telecommunications, solar, wind, and energy storage projects, including design, engineering, maintenance, and repair of renewable energy systems. Los Palos and Altus retained Pearce to perform reconfiguration, testing, and commissioning work on the Facility's rooftop solar array, including on June 17, 2026, the date the fire is believed to have ignited during that work. The Pearce technicians working on the Facility's roof on June 17, 2026, were identified to LAFD as employees of "Pearce-Renewables" or "Pearce Renewables." LAFD Report at 8–9.

**Defendant 6: Northern Electric Power Technology, Inc. (“NEP”)**

32. On information and belief, Defendant Northern Electric Power Technology, Inc. (“NEP”) is a Delaware corporation with its principal place of business at 2570 N. 1st Street, Suite 200, San Jose, California. On information and belief, NEP is a designer, manufacturer, and/or supplier of rapid-shutdown devices, transmitters, and related module-level power-electronics and communication components (“NEP devices”) that were installed in, or intended for installation in, the Facility’s rooftop solar array.

33. On information and belief, the pre-energization safety-testing protocol that Lineage required before the solar array could be re-energized expressly included an “NEP device check in record, verifying no duplicate serial numbers.” On information and belief, transmitters and/or rapid-shutdown devices bearing duplicate identification numbers were present in the array and were identified as a fire risk capable of causing the devices to malfunction. Plaintiffs allege on information and belief that NEP’s components, and/or the design, manufacture, or defective condition of those components, contributed to the ignition and/or spread of the fire. NEP is a citizen of Delaware, its state of incorporation, and of California, the location of its principal place of business.

**Defendant 7: HD Hyundai Energy Solutions America, Inc. (“Hyundai”)**

34. Defendant HD Hyundai Energy Solutions America, Inc., formerly named Hyundai Energy Solutions America, Inc. (“Hyundai”), is a California corporation with its principal place of business at 3 Corporate Park, Suite 235, Irvine, California 92606, and is a citizen of California. On information and belief, Hyundai designed, manufactured, and supplied the solar modules (panels) installed in the Facility’s rooftop solar array, including the modules at the strings in the area where the Fire originated, and on information and belief the Hyundai modules and their fittings contributed to the electrical failure and ignition that caused the Fire.

**Defendant 8: Amphenol Corporation (“Amphenol”)**

35. Defendant Amphenol Corporation ("Amphenol") is a Delaware corporation with its principal executive offices and principal place of business at 358 Hall Avenue, Wallingford, Connecticut 06492, and is a citizen of Delaware and Connecticut. On information and belief, Amphenol designed, manufactured, and supplied the electrical connectors used to interconnect the solar modules and related components in the Facility's rooftop solar array — including the Amphenol connectors installed on the Hyundai modules at the area of fire origin — and on information and belief those connectors were among the incompatible and improperly connected components that created the risk of arcing and ignition that caused the Fire.

**Does 1 through 50**

36. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as Does 1 through 50, inclusive, are presently unknown to Plaintiffs, who therefore sue these Defendants by fictitious names. Plaintiffs are informed and believe, and on that basis allege, that each Doe Defendant is in some manner legally responsible for the events and damages alleged herein. On information and belief, the Doe Defendants may include: (a) field technicians or subcontractors who conducted or assisted with the solar array reconfiguration, testing, and/or commissioning work on or before June 17, 2026; (b) manufacturers, distributors, designers, and/or installers of solar panels, rapid-shutdown devices, lithium-ion battery or energy-storage systems, inverters, connectors, or refrigeration equipment present at the Facility; (c) other roof contractors present at the Facility during the relevant period; and (d) predecessor or affiliate entities responsible for the Facility or the solar array. Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of the Doe Defendants once ascertained.

37. On information and belief, at all relevant times each Defendant was the agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of each of the other Defendants and, in doing the acts and omissions alleged herein, acted within the course and scope of that relationship and with the knowledge, permission,

consent, and/or ratification of the other Defendants, such that each Defendant is jointly and severally liable for the acts and omissions alleged herein.

**JURISDICTION AND VENUE**

**A. Subject-Matter Jurisdiction**

38. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (a) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs — the putative Classes encompass thousands of residents, property owners, and businesses across multiple densely populated Southern California counties, and comparable industrial fire and toxic-release class actions have resulted in damages substantially exceeding this threshold; (b) the putative Classes consist of well more than 100 members — the SCAQMD advisory area alone covered millions of residents and thousands of businesses; and (c) minimal diversity exists, because at least one member of the proposed Classes (the named Plaintiffs, each a citizen of California) is a citizen of a state different from at least one Defendant (for example, Plaintiffs are citizens of California, while Defendant Altus Power, Inc. is a citizen of Delaware and Connecticut, and Defendant Lineage, Inc. is a citizen of Maryland and Michigan).

**B. Personal Jurisdiction**

39. This Court has personal jurisdiction over each Defendant. The Facility is located in California, and Plaintiffs' claims arise out of and relate to each Defendant's California-directed conduct — including the ownership, operation, maintenance, lease, reconfiguration, testing, and energization of the Facility and its rooftop solar array, and the resulting Fire and release of hazardous substances in and around Los Angeles. Defendants HD Hyundai Energy Solutions America, Inc. and Northern Electric Power Technology, Inc. are citizens of California and are subject to this Court's general jurisdiction. On information and belief, each of the remaining Defendants purposefully availed itself of the privilege of conducting activities in California and purposefully directed its relevant conduct at California, such that the

exercise of personal jurisdiction comports with due process and traditional notions of fair play and substantial justice. See *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945); *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,* 592 U.S. 351 (2021).

**C. Venue**

40. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims — including the Fire, the release of toxic smoke, ash, soot, particulate matter, accelerants, and other hazardous substances, and the resulting harm to Plaintiffs and the Classes — occurred in this District, and because the Facility that is the subject of this action is situated in this District.

## FACTUAL BACKGROUND

**A. The Facility and the Parties' Respective Roles**

41. Lineage refers to itself as the world's leading cold storage facility network offering innovative solutions for protecting temperature-controlled products through Lineage's in-house data science team, including experts in data, mathematics, and engineering. This is a self-professed sophistication that heightened, rather than diminished, its responsibility to operate the Facility safely within this community.

42. The Facility sits in the heart of Boyle Heights, a densely populated predominantly Mexican and Mexican American community comprising a mixture of residential and industrial uses, with homes, schools, and small businesses in the vicinity of the Facility.

43. The Facility purportedly offers cold storage with "precision temperature control" and "blast freezing," a process for rapidly freezing foods such as meats, seafood, or prepared meals.

44. The Facility uses, handles, and stores explosive, flammable, and hazardous substances. The cold storage and blast freezing systems require the storage and use of hazardous substances including, but not limited to, anhydrous ammonia and combustible foam containing potentially carcinogenic materials, such as

polyisocyanurate, and highly flammable plastic-wrapped food products.

45. Anhydrous ammonia is a "regulated substance" explicitly listed in Section 112(r)(3) of the Clean Air Act ("CAA"), 42 U.S.C. § 7412(r)(2)(B) & (r)(3), and 40 C.F.R. § 68.130 (designating regulated substances). Anhydrous ammonia is a "hazardous substance" for purposes of Section 102 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9602, and 40 C.F.R. § 302.4 (designating hazardous substances). Anhydrous ammonia is also an "extremely hazardous substance" for purposes of Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11002, and 40 C.F.R. Part 355, Appx. A & B.

46. Anhydrous ammonia is a well-known hazardous material that is flammable and explosive. It is also corrosive to the skin, eyes, and lungs. Exposure to anhydrous ammonia can lead to death or serious injury. Incidents at cooling facilities involving anhydrous ammonia have resulted in injuries and fatalities on-site and have caused adverse consequences to the public. In response to these dangers, the EPA provides guidelines specific to refrigeration and cold-storage system operators to prevent and respond to accidents involving anhydrous ammonia.[8]

47. The Facility's ammonia refrigeration system ran from exterior tanks through pipelines into the Facility's freezers. LAFD Report at 10. LAFD's hazardous-materials team monitored for ammonia at the scene because of the known presence of that chemical at the Facility. *Id.* at 4.

48. At the time of the Fire, the Facility held approximately 85-88 million pounds of frozen food. It was equipped with an industrial refrigeration system and lithium-ion battery-powered equipment, in addition to the rooftop solar array

[8] *See* EPA Region 7, *Accident Prevention and Response Manual for Anhydrous Ammonia Refrigeration System Operators* (June 2015), available at https://www.epa.gov/sites/default/files/2015-05/documents/accident_prevention_ammonia_refrigeration_5-20-15.pdf.

described below. On information and belief, the Facility also stored large quantities of highly flammable plastic-wrapped food products which, together with the Facility's combustible polyurethane and polyisocyanurate foam insulation, and the high-energy rooftop solar installation, concentrated a dangerous volume of combustible and hazardous materials in the densely populated Boyle Heights neighborhood.

49. Defendant Chill Build is the Facility's fee owner and landlord, and was responsible for the premises, its structural and fire-safety systems. Chill Build permitted the contractor activity to occur on the roof and elsewhere at the Facility during the time period leading up to the start of the fire.

50. Defendant Lineage was the tenant-operator running the Facility's cold-storage and blast-freezing business and maintaining its refrigeration system; Lineage also subleased the roof to Los Palos for installation and operation of the solar array, retaining a landlord's interest in, and oversight role over, work performed on that roof — an oversight role that, as alleged below, Lineage actively exercised.

51. Defendants Altus Power and Los Palos owned and operated the rooftop solar array across substantially the entire roof of the Facility and were responsible for its maintenance, repair, testing, and safe operation; on information and belief, Altus Power directed and controlled that work, including the "Re-Configuration Project" described below, notwithstanding Los Palos's formal status as tenant under the rooftop lease.

52. Defendant Pearce was engaged by Altus and Los Palos to perform reconfiguration, testing, and commissioning work on the array; Pearce's business includes the design, engineering, maintenance, and repair of renewable energy systems, and Pearce personnel were performing such work at the Facility the afternoon of June 17, 2026 when the fire ignited.

53. On information and belief, Defendant NEP designed, manufactured, and/or supplied rapid-shutdown devices, transmitters, and related module-level power-electronics and communication components installed, or intended for

installation, in the rooftop solar array.

**B. Defendants Were on Notice of the Risk of a Fire and Related Hazards**

54. Defendants were on notice of the safety issues at this particular facility. A prior fire occurred at the Facility's rooftop solar array on August 14, 2024 (the "2024 Fire"), caused by an electrical problem involving the rooftop solar panels. The 2024 Fire damaged the solar array, compromised a portion of the Facility's building structure, destroyed stored product, and interrupted operation of the Facility, before being confined and extinguished.

55. LAFD responded to the 2024 Fire at 9:10 a.m. on August 14, 2024; responding fire companies could see heavy smoke billowing from the roof while en route, and more than 80 LAFD firefighters, with assistance from the Los Angeles County Fire Department, took 48 minutes to extinguish it. LAFD warned at the time that, without its crews' aggressive and timely action, the fire could have continued to spread from solar array to solar array and extended into the interior of the building, with devastating results.[9] That is precisely what happened on June 17, 2026.

56. On information and belief, around June 23, 2025, Altus sought to re-energize the solar array to complete testing and commissioning following repairs from the 2024 Fire. On information and belief, on June 25, 2025, Lineage directed Altus's contractor to shut off the solar array based on Lineage's concern that certain components used in the array could pose a safety hazard, and Lineage made clear to Altus that it would not permit re-energization of the array unless and until Altus addressed Lineage's safety concerns.

57. After the 2024 Fire, Lineage lobbied City agencies about the array's safety equipment. In July 2025, Lineage's vice president of energy and sustainability

---

[9] Press Release, Los Angeles Fire Department, *Firefighters Save Building from Solar Panel Blaze in Boyle Heights* (Aug. 14, 2024), available at https://lafd.org/news/firefighters-save-building-solar-panel-blaze-boyle-heights.

and a Lineage lobbyist contacted the Los Angeles Department of Building and Safety to ask whether the array's rapid shutdown switch — a device the California Electrical Code requires so that the array's voltage can be quickly reduced to a level safe for first responders — could be removed; they were told the switch is required and cannot be removed or omitted. Between April and December 2025, Lineage paid its lobbying firm $45,000 to lobby the Department of Building and Safety, LAFD, and the Los Angeles Department of Water and Power regarding, among other things, an alternative to the array's rapid shutdown devices. Lineage has characterized these efforts as an inquiry into a safer alternative to rapid shutdown devices; no variance or exemption was granted. The Department of Water and Power has stated that Lineage expressed interest in extending an agreement to continue selling power from the solar array through the City's Feed-in Tariff Program. Since the Fire, Lineage has nonetheless publicly maintained that it does not own, operate, or maintain the solar array.[10]

58. On information and belief, Lineage and Altus thereafter resolved their dispute over the redesign and repairs required to re-energize the array, and Altus agreed to undertake a "Re-Configuration Project" to remove the TIGO RSDs from the array, inspect and replace mismatched connectors used in the array, and inspect and repair or replace, as necessary, all wire management associated with the array.

59. The 2024 Fire and the subsequent dispute over the safety of the TIGO RSDs, mismatched connectors, and wire management placed every Defendant on actual notice, well before June 17, 2026, of the specific fire hazard created by the rooftop solar array — including the risk that electrical and maintenance activity on the array could ignite a fire near the Facility's combustible polyurethane foam

[10] Alex Wigglesworth, *Solar panels scrutinized after massive L.A. cold storage fire*, L.A. TIMES, reprinted in FIRERESCUE1 (July 13, 2026), available at https://www.firerescue1.com/building-construction/solar-panels-scrutinized-after-massive-l-a-cold-storage-fire.

insulation, and that incompatible or improperly connected array components created a recurring and unresolved ignition risk.

60. According to Lineage employee Paul Scott, Pearce had been working on the solar equipment for months, making repairs to the system after the 2024 Fire. LAFD Report at 9. On information and belief, there are no City records reflecting that Defendants, or any other entity, obtained permits for, or inspections of, the work performed on the Facility's roof and solar array after the 2024 Fire, and City officials are investigating whether that work was performed without required permitting. If electrical reconfiguration, testing, and energization work on the array was performed without the permits and inspections required by applicable building and fire codes, that compounded the known hazard and deprived the community of the safety oversight those codes are designed to provide.

61. Defendants were further on notice of the dangers of their cold-storage operations from a separate fire at another Lineage facility. On information and belief, on or about April 21, 2024, a fire ignited at Lineage's cold-storage facility in Finley, Washington, and smoldered for nearly two months, and residents near that facility reported respiratory illnesses including emphysema, pneumonia, bronchitis, and sinus infections.

62. Defendants were also on notice regarding the safety issues posed by their activities. Since as early as 1987, the EPA has published numerous chemical safety alerts warning operators of cold-storage and refrigeration systems of the dangers posed by anhydrous ammonia to workers and the public.[11] More specifically, in 2023,

[11] *See, e.g.*, EPA, *Prevention Reference Manual: Chemical Specific, Vol. 11, Control of Accidental Releases of Ammonia* (Aug. 1987), available at https://nepis.epa.gov/Exe/ZyPDF.cgi/2000AZT5.PDF?Dockey=2000AZT5.PDF; Office of Solid Waste and Emergency Management, EPA, *Hazards of Ammonia Releases at Ammonia Refrigeration Facilities (Update)* (EPA 550-F-01-009) (Aug. 2001), available at https://nepis.epa.gov/Exe/ZyPDF.cgi/P1002QOU.PDF?Dockey=P1002QOU.PDF.

the EPA fined Lineage for failing "to comply with regulations intended to protect the surrounding community from accidental releases" of anhydrous ammonia at Lineage's cold-storage facility in Altoona, Iowa.[12] Lineage has also been involved in litigation pertaining to the deadly effects of anhydrous ammonia leaks at their facilities.[13]

**C. Causation**

63. Plaintiffs allege the following causation narrative on information and belief, based in substantial part on facts and positions pleaded by Lineage in its own related civil action against Altus Power, Los Palos, and Pearce arising from the same fire. Plaintiffs do not represent that these facts have been judicially established, and Defendants Altus, Pearce, and NEP are entitled to contest them.

64. On information and belief, Altus controlled the Re-Configuration Project. Its engineers prepared the plans and testing procedures (with Lineage's review and approval), hired Pearce in February 2026, set the scope, managed the day-to-day work, and required Pearce to cut labor costs by nearly 10%. Under the contract, Altus's engineer had to approve all testing before the project could be completed. Lineage Compl. ¶¶ 44, 47–48, 55.

65. On information and belief, as of May 2026, more than 200 "connector failures" had been identified in the array, several of which were located in the same

[12] Press Release, EPA, *EPA Fines Altoona, Iowa, Company for Alleged Chemical Risk Prevention Violations* (Nov. 13, 2023), available at https://www.epa.gov/newsreleases/epa-fines-altoona-iowa-company-alleged-chemical-risk-prevention-violations.

[13] *See, e.g.*, *Lineage Logistics, LLC v. Primus Builders, Inc.*, 2024 WL 759948, at *1 (N.C. Super. Feb. 23, 2024) (concerning the death and serious injury to individuals working on a blast cell after they "inadvertently punctured a coil containing liquid anhydrous ammonia, releasing nearly 1,000 pounds of ammonia into the [f]acility"; Lineage argued that the leak caused "massive cleanup and investigation costs, disruption to its business operations, [] significant loss of products that were destroyed or rendered unusable because of the ammonia exposure," and Lineage was facing "claims from property owners").

area of the array in which the fire began.



Lineage Compl. ¶ 6 (yellow dots depict identified "connector failures"; the red box depicts the portion of the array where the Fire began).

66. On information and belief, post-fire inspection revealed that Pearce had used thousands of "jumper" connections to join devices whose cables were otherwise incompatible—including because Altus had approved and/or sourced rapid-shutdown devices with connectors that were not compatible with the connectors used on the solar panels themselves—creating thousands of additional potential points of electrical failure. Lineage alleges that neither Altus nor Pearce obtained Lineage's approval for the use of such jumpers. Lineage Compl. ¶ 50. On information and belief, Pearce used several different brands of jumper connectors, at times as many as three different brands in a single location, further increasing the risk of incompatibility or ignition; post-fire inspections also revealed a multitude of connectors whose tightening bolts were loose and/or cross-threaded in a manner that failed to create a tight connection, allowing moisture intrusion and creating a potential ignition risk, as well as areas of damaged wiring that likewise created an ignition risk.

67. On information and belief, in or about April 2026, Lineage identified that Pearce was attempting to use transmitters bearing duplicate identification numbers, a condition that can cause rapid-shutdown devices to malfunction and create a fire risk; on information and belief, this fire risk involved components supplied by NEP, and neither Altus nor Pearce had independently identified it before Lineage brought it to Altus's attention.

68. On information and belief, on June 11, 2026, Paul Scott, Lineage's Director of Operational Excellence, sent an email to John Clasby, Altus's project manager for the Re-Configuration Project, specifying that the array was not to be re-energized until a defined set of safety checks had been completed, including safety voltage checks on every string, full-sun voltage checks on every string, an "NEP device check in record, verifying no duplicate serial numbers," transmitter testing sub-array by sub-array, and Megger testing for voltage leakage on all insulated wire runs, together with a full-system walk-through of the array to be conducted with a Lineage representative present. Lineage advised Altus that a Lineage representative would be on site to conduct that walk-through on June 22–23, 2026. Lineage Compl. ¶¶ 58–59.

69. On information and belief, notwithstanding Lineage's explicit and documented requests, Defendants Altus and Pearce began to energize the solar array on or about June 5, 2026, and continued to energize additional portions of the array from June 10 through June 17, 2026, without, according to Lineage, completing the safety testing Lineage had requested and without disclosing to Lineage the extent of the energization or the results of such testing as had been performed.

70. Lineage further alleges that Pearce did not have sufficient personnel or fire-suppression equipment on the roof on the day of the Fire to conduct fire watch or to combat any fire that might occur. Lineage Compl. ¶ 65.

71. Lineage publicly stated that it believes the fire originated on the roof while the solar company's subcontractors were servicing the solar array and that the fire "started on the roof when the owner of the solar array, Altus Power, was doing

tests."[14] Altus Power stated that "[t]he cause of the fire where our rooftop solar array is located at the Los Palos Street facility has yet to be determined,"[15] while stating it was cooperating with investigators.

**D. Lineage Retained and Exercised Safety Oversight of the Solar Array Work**

72. Lineage has repeatedly stated in public that it does not own, operate, or maintain the solar array, and in its own lawsuit it asserts that it had no oversight responsibility over the work on the array. Lineage Compl. ¶ 54. In fact, Lineage retained — and exercised — substantial control over the safety of the work being performed on the array on its roof.

73. Lineage's own employee was responsible for the array's safety. During LAFD's investigation, Lineage employee Paul Scott — whom the LAFD Report describes as a Lineage electrical engineer, and whom Lineage describes as its Director of Operational Excellence (Lineage Compl. ¶ 58) — was identified as the Lineage supervisor responsible for verifying the operational safety of the solar panels before they were placed into service. Scott told LAFD that he had given Pearce a "Playbook" outlining Lineage's expectations and requirements for putting the solar system on the building, and that his responsibility was to perform quality-assurance checks at different stages of the installation, including Megger (insulation) testing, ground testing, and open-circuit testing. LAFD Report at 9.

74. Lineage also controlled access to the roof. Lineage's Facilities Maintenance Manager, Cynthia Fernandez, oversaw all visitors to the property and

---

[14] Health concerns intensify over Boyle Heights fire as LA officials say smoke will blanket city for 3 more days, CBS News Los Angeles (updated Jun. 22, 2026), available at https://www.cbsnews.com/losangeles/news/boyle-heights-fire-health-concerns-air-quality-lineage-los-angeles/.

[15] Los Angeles firefighters say fire at Boyle Heights cold storage facility has been knocked down, CBS News Los Angeles (updated Jun. 25, 2026), available at https://www.cbsnews.com/losangeles/news/boyle-heights-warehouse-fire-june-24/.

checked in the four Pearce technicians who arrived at the Facility between approximately 6:00 and 6:30 a.m. on June 17, 2026. LAFD Report at 8–9.

75. Lineage's own allegations confirm the extent of its control. Lineage alleges that: (a) after the 2024 Fire, Lineage directed Altus's contractor to shut off the array and made clear that it would not allow the array to be re-energized unless Altus addressed Lineage's safety concerns (Lineage Compl. ¶ 41); (b) the work letter, specifications, commissioning and testing procedures, and bidding and permitting plans for the Re-Configuration Project were subject to Lineage's review and approval (id. ¶ 44); (c) Altus and Pearce used jumpers without obtaining Lineage's approval (id. ¶ 50); (d) in April 2026, a Lineage employee identified that Pearce was attempting to use transmitters with duplicate identification numbers — a fire risk that neither Altus nor Pearce had identified — and brought it to Altus's attention for remediation (id. ¶ 54); (e) on June 4, 2026, when Altus and Pearce requested to connect the array to the Facility's power to begin testing portions of the system, Lineage allowed them to do so for limited purposes (id. ¶ 57); and (f) on June 11, 2026, Scott identified safety tests that should be performed before the array's DC disconnects were energized and scheduled Lineage's own walk-through of the system for June 22–23, 2026 (id. ¶¶ 58–59).

76. Lineage nonetheless failed to exercise that oversight in a manner that would protect the surrounding community. Unlike in June 2025, when Lineage directed that the array be shut off, Lineage in June 2026 — knowing of the 2024 Fire, and knowing that Pearce might soon finish its work and that the required safety tests had not been performed (Lineage Compl. ¶ 5) — merely requested by email that certain tests be performed before the system was energized and scheduled its own walk-through for nearly two weeks later. On information and belief, Lineage also knew, before the Fire, of the hundreds of connector failures that had been identified in the array. On information and belief, Lineage took no steps to require that the array be locked out or kept de-energized pending its walk-through, to condition Pearce's

access to the roof on completion of the required testing, or to monitor whether the array was being energized.

77. As a result, Lineage did not know what was happening on its own roof, or take the needed steps to be informed. Lineage admits that Pearce began energizing the array on June 5, 2026 "unbeknownst to Lineage," and that Altus and Pearce did not make Lineage aware of the extent of their work. Lineage Compl. ¶¶ 61–62. Scott likewise told LAFD that neither he nor Lineage had access to the array's Supervisory Control and Data Acquisition ("SCADA") system; that Lineage had "no way of knowing" whether Pearce was following the Playbook as it assembled and pre-commissioned the system; that it was possible Pearce was sending power to the grid before the panels were commissioned; and that, because the safety checks and walk-through were not scheduled until the week of June 22, no tests had been performed. LAFD Report at 9. Scott — the Lineage supervisor responsible for verifying the array's operational safety — was out of state when the Fire broke out. *Id*.

**E. The LAFD Investigation**

78. On August 25, 2026, LAFD investigators completed their origin-and-cause report on the Fire. LAFD determined that the Fire originated on the roof of the Facility, within the area of the rooftop solar array that LAFD designated "Grid 2," on the north (Union Pacific Avenue) side of the building, as depicted in the following diagram from the LAFD Report. LAFD Report at 5, 11–12.




LAFD Report, Exhibit A.

79. Pearce personnel were on the roof when the Fire began. Four Pearce technicians checked in at the Facility on the morning of June 17, 2026; one left for another job site, leaving three on the roof. LAFD Report at 8–9. According to a Pearce health-and-safety representative who relayed his account to LAFD, the technician who first saw the Fire, Terez Edmonds, was working with two other technicians near the center of the roof, in Grids 11 and 12, when he saw smoke coming from Grid 2; when he reached Grid 2, he observed fire coming from underneath a solar panel in the middle of the grid and a panel that had melted, tried to put the fire out with a fire extinguisher, and observed additional fires igniting nearby. *Id.* at 9–10. Edmonds did not return LAFD's call. *Id.* at 9.

80. Edmonds did not call 911. Instead, he called a Lineage quality-assurance supervisor, Erica Carbajal, who called Fernandez; Fernandez then called Edmonds to

confirm that there was a fire on the roof before calling 911. LAFD Report at 8, 10. The first 911 call came not from Lineage or Pearce but from a neighbor across the street, at approximately 2:35 p.m. *Id.* at 8. According to Carbajal, Edmonds told her that the Pearce technicians were on the roof performing "fire watch" when the fire broke out. *Id.* at 10. LAFD found several portable fire extinguishers near Grid 2, one of which still had its safety pin in place, indicating that it had not been discharged. *Id.* at 11.

81. The Fire spread rapidly. LAFD's review of aerial footage shows heavy fire and smoke in Grid 2 by 2:57 p.m.; although firefighters had nearly extinguished the fire in Grids 2 and 3 by 3:08 p.m., by 3:14 p.m. there was heavy fire and smoke in Grids 3, 4, and 7. LAFD Report at 7. Fire patterns showed the fire spreading northeast and southeast from Grid 2. *Id.* at 11. The roof — corrugated metal overlaid with rigid insulation and TPO waterproofing — was covered with approximately 12,400 solar panels, and approximately half of the roof structure ultimately collapsed. *Id.* at 4, 11. The fire traveled from the roof down into the Facility, damaging the entire area of Freezer 2 from the top down, and caused extensive damage to approximately 50% of the building and to 100% of its contents. *Id.* at 4, 12.

**F. The Fire**

82. On June 17, 2026, at approximately 2:30 p.m., the fire ignited on or near the rooftop solar array while Pearce personnel were performing testing, commissioning, or related work on the reconfigured system. The fire rapidly escalated into a massive industrial blaze that burned for approximately a week.

83. More than 130 LAFD firefighters responded to the fire, which LAFD representatives described as very complex and posing numerous safety hazards. The fire sent a thick black plume of toxic smoke into the air that could be seen for miles. At the time, LAFD Chief Jaime Moore reported that the fire had compromised an anhydrous ammonia line, causing off-gassing and several small explosions, and that

fire crews were forced to retreat from the roof when ammonia was released.[16] Hazardous materials specialists and air monitoring units were deployed to the scene, as well. Air quality readings also reported the presence of hydrogen fluoride, which fire officials told reporters that a lithium-ion battery — likely from a battery-operated forklift — was burning.[17] The scale of the emergency response reflected the severity of the Fire. At least four water-dropping helicopters were brought in to help gain control of the rapidly growing fire. This is an unprecedented measure for a structure fire in a densely populated area due to safety concerns. The fire continued to burn at the Site continually for a week after the fire initially ignited, forcing LAFD to deploy additional water-dropping helicopters through June 23, 2026, and releasing large amounts of smoke and toxic fumes into the surrounding area.

84. On the night of June 19, 2026, firefighters battled a major flare-up that sent black and white smoke billowing from the building and prompted officials to open two emergency shelters shortly after midnight and to again urge residents to wear masks, remain indoors, and keep their air conditioning off despite temperatures approaching 90 degrees.

85. The Fire was not quickly contained. On information and belief, although the Fire was "officially knocked down" on the evening of June 24, 2026, and firefighters transitioned to searching the facility to extinguish hotspots and smoldering debris. Flare-ups continued at least through July 6, 2026, requiring firefighters to

---

[16] Jonathan Lloyd and Danielle Smith, *Hourslong shelter-in-place order lifted for Boyle Heights warehouse fire*, NBC4 LOS ANGELES (Jun. 18, 2026), available at https://www.nbclosangeles.com/news/local/boyle-heights-fire-lineage/3905682/; Alex Wigglesworth, *Solar panels scrutinized after massive L.A. cold storage fire*, L.A. TIMES, reprinted in FIRERESCUE1 (July 13, 2026), available at https://www.firerescue1.com/building-construction/solar-panels-scrutinized-after-massive-l-a-cold-storage-fire.

[17] *See* Jocelyn Fiset, *Shelter-in-place reinstated as crews vent hazardous smoke from Boyle Heights storage facility*, KTLA5 (Jun. 18, 2026), available at https://ktla.com/news/local-news/boyle-heights-fire-smoke-shelter-in-place-order/.

deploy water cannons to fight these persistent flames.

### G. Toxic Releases

86. The fire caused the release of a dangerous mixture of toxic smoke, ash, soot, airborne particulate matter, accelerants, and other hazardous toxins and combustion byproducts into the surrounding community. The fire ignited in and was accelerated by high-energy electrical equipment and combustible materials present on and around the rooftop — including the solar array and the Facility's polyurethane insulation — each of which acted as an accelerant once ignited.

87. The Facility's industrial refrigeration system used large quantities of anhydrous ammonia, an extremely hazardous and toxic chemical. In the early hours of the Fire, LAFD Chief Jaime Moore publicly reported that the fire had compromised an anhydrous ammonia line and that firefighters were forced to retreat because of the danger posed by the ammonia, and LAFD initially reported that ammonia had leaked during the Fire. A suspected ammonia leak contributed to the shelter-in-place order issued for the surrounding area.[18]

88. Chief Moore later stated that there had been no ammonia leak, and that the vapor that initially caused concern had been cold air mixing with hot air.[19] The LAFD Report states that LAFD's hazardous-materials team entered portions of the building and the surrounding outdoor areas on June 18, 2026 — the day after the Fire began — and that its readings were within normal limits for a common structure fire, with no ammonia detected. LAFD Report at 4, 10. Lineage, for its part, asserts that the ammonia was pumped out of the refrigeration system shortly after the Fire began

---

[18] Salvador Hernandez, *Lineage warehouse in Boyle Heights is searched in criminal probe, officials say*, L.A. TIMES (Oct. 6, 2026), available at https://www.latimes.com/california/story/2026-10-06/lineage-warehouse-criminal-investigation.

[19] Salvador Hernandez, *Lineage warehouse in Boyle Heights is searched in criminal probe, officials say*, L.A. TIMES (Oct. 6, 2026), available at https://www.latimes.com/california/story/2026-10-06/lineage-warehouse-criminal-investigation.

and before the fire reached that system, and that the ammonia was subsequently removed from the site.[20]

89. Information bearing on what happened to the Facility's ammonia during the Fire is uniquely within Defendants' possession and control, and Defendants have not disclosed it — including the quantity of ammonia in the system when the Fire ignited, when and how it was pumped out and removed from the site, the quantity recovered, and the associated alarm, sensor, and data-log records. The Fire damaged at least one of the Facility's ammonia pumps, visibly darkening the white pump as though it had been exposed to flame Lineage itself seeks to recover from Altus and Pearce the costs of "ammonia removal and offsite transport" that it incurred as a result of the Fire. Lineage Compl. ¶ 75.

90. Ammonia continued to be detected near the Facility after the Fire. Air-quality sensors operated by SCAQMD at Eastman Avenue Elementary School and Robert Louis Stevenson Middle School, both less than a mile from the Facility, were not equipped to measure ammonia until July 23, 2026; once they were, they recorded repeated ammonia spikes, including in early August 2026. An August 5, 2026 analysis by researchers at the University of California, Irvine and East Yard Communities for Environmental Justice found high levels of ammonia in streets close to the Facility.[21] Testing by Lineage, community scientists, and SCAQMD likewise found elevated ammonia levels near the Facility after the Fire, though reportedly below the threshold requiring action to protect public health.[22] Ammonia is generated by decomposing

[20] Salvador Hernandez, *Lineage warehouse in Boyle Heights is searched in criminal probe, officials say*, L.A. TIMES (Oct. 6, 2026), available at https://www.latimes.com/california/story/2026-10-06/lineage-warehouse-criminal-investigation.

[21] Lucas Brady Woods, *What air quality sensors around Boyle Heights warehouse are telling us*, LAIST (Aug. 12, 2026), available at https://laist.com/news/climate-environment/air-quality-boyle-heights-warehouse-explained.

[22] Christopher Damien & Laura Anaya-Morga, *What was in the air after the Lineage fire? New lawsuits are demanding information*, LAIST (Oct. 7, 2026), available at

food as well as used as a refrigerant; on information and belief, the ammonia detected near the Facility after the Fire emanated from the Facility, whether from its refrigeration system or from the tens of millions of pounds of food left to rot there as a result of the Fire.

91. On or about June 18, 2026, fire officials reported a light reading of hydrogen fluoride — a highly corrosive and toxic substance generated as a byproduct of burning lithium-ion batteries — which they attributed to a lithium-ion battery that likely came from a battery-operated forklift at the Facility.[23] Exposure to hydrogen fluoride can cause severe respiratory, ocular, and dermal injury.

92. The Facility's dense polyurethane foam insulation burned throughout the multi-day fire, releasing toxic volatile organic compounds into the surrounding air. The East Yards Coalition for Environmental Justice publicly raised concerns regarding these releases and their effect on the surrounding community.

93. South Coast Air Quality Management District ("SCAQMD") air monitoring showed fine particulate matter (PM2.5) reaching "Unhealthy for Sensitive Groups" to "Very Unhealthy" categories across a wide geographic area over multiple days during and after the fire.

94. Air monitoring confirmed hazardous conditions across the surrounding community. On information and belief, on June 22, 2026, air-quality sensors near the Facility recorded an Air Quality Index reading of approximately 621 — far above the level the U.S. Environmental Protection Agency classifies as "hazardous." On information and belief, public-health data showed that emergency-room visits in the surrounding area surged between June 17 and June 25, 2026.

95. The air-quality advisories issued in connection with the Fire warned,

---

https://laist.com/news/health/what-was-in-the-air-after-lineage-fire-lawsuits.

[23] Jocelyn Fiset, *Shelter-in-place reinstated as crews vent hazardous smoke from Boyle Heights storage facility*, KTLA5 (Jun. 18, 2026), available at https://ktla.com/news/local-news/boyle-heights-fire-smoke-shelter-in-place-order/.

among other things, that "smoldering material may continue to affect air quality directly downwind of the facility," that "[a]sh may also deposit across the area," and that monitoring readings "do not account for large ash particles and debris" settling onto homes, yards, and businesses. On information and belief, the combustion of the Facility's dense polyurethane and polyisocyanurate foam insulation released toxic and potentially carcinogenic volatile organic compounds into the surrounding air.

**H. The Significant Impact on the Surrounding Neighborhoods and the Geographic Scope**

96. The Incident heavily impacted the surrounding areas. At 5:00 p.m. on Wednesday June 17, 2026, the CAQMD issued a Particle Pollution Advisory. SCAQMD warned that "smoldering material may continue to affect air quality directly downwind of the facility."[24] SCAQMD further cautioned that "[a]sh may also deposit across the area," but air quality readings "do not account for large ash particles and debris."[25]

97. Shortly after the fire began, LAFD ordered an initial shelter-in-place for the surrounding areas. The order was lifted at approximately 8:45 p.m. on June 17, 2026. The initial shelter-in-place zone encompassed the following areas:

[24] SCAQMD Advisory dated June 17, 2026, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.aqmd.gov/docs/default-source/news-archive/2026/south-coast-aqmd-issues-particle-pollution-advisory-due-to-structure-fire-in-boyle-heights---june-17-2026.pdf; SCAQMD Advisory dated June 18, 2026, available at https://xappp.aqmd.gov/advisories/Home/Details/fe921a83-f771-48bb-90a7-eb850c10f0fe.

[25] *Id.*




98. On June 18, 2026, the shelter-in-place was reinstated as LAFD undertook measures to ventilate hazardous smoke from the Site. The order remained in place until June 19, 2026. Despite lifting the shelter in place, officials opened two emergency shelters just after midnight that evening. Officials urged residents to wear masks and remain indoors and warned residents to keep windows closed and avoid using air conditioning units even as temperatures approached 90 degrees.

99. Flare-ups within the building and ongoing smoldering on the rooftop prompted smoke advisory and air quality warnings to remain in effect through 6 p.m. on June 24, 2026, with air quality levels rated as high as "very unhealthy" for portions of the affected area. Residents across Los Angeles County received emergency alerts pertaining to the air quality warnings. With toxic smoke continuing to emanate from the Site, air-quality warnings associated with the Fire extended across a broad region, including as far as the Coachella Valley.

100. On or about June 20, 2026, the City of Los Angeles (Mayor Karen Bass) and the State of California (Governor Gavin Newsom) each declared a state of emergency in response to the fire; the Los Angeles County Board of Supervisors

ratified an emergency declaration on or about June 23, 2026.

101. On the evening of June 22, 2026, Environmental Protection Agency sensors located near the Site detected a dramatic spike in pollutants as the Air Quality Index surged to 621, well over the "hazardous" threshold.[26]

102. Local authorities issued a shelter-in-place order for the community immediately surrounding the Facility, and SCAQMD issued a particle pollution advisory covering central Los Angeles County, the San Gabriel Valley, the East San Fernando Valley, and the Northwest San Bernardino Valley, which was extended multiple times as the fire continued to burn. SCAQMD sensors recorded "Very Unhealthy" PM2.5 readings in Boyle Heights on multiple days.

103. The Los Angeles Unified School District relocated multiple Boyle Heights-area schools due to air-quality concerns, and residents throughout Boyle Heights, East Los Angeles, and surrounding communities reported plastic and chemical odors, throat irritation, watering eyes, and difficulty breathing throughout the duration of the fire.

104. The economic impact of the fire extended well beyond the shelter-in-place zone. Businesses throughout the surrounding area — including small, self-employed, and informal-economy operations such as street and food vendors — were forced to suspend or curtail operations as a result of the fire, the resulting smoke and ash conditions, and the associated public-safety response, with some workers losing weeks of income and, in some instances, becoming unable to pay rent; for some businesses, closure continued for months and, on information and belief, remained ongoing as of the filing of the this consolidated complaint.

105. Lineage claims that their "top priority is the health and safety of our

[26] *See* Kevin Ozebek, *EPA tracking air quality as dangerous pollution levels spike overnight near Boyle Heights fire*, ABC7 Eyewitness News (Jun. 23, 2026), available at https://abc7.com/post/epa-tracking-air-quality-dangerous-pollution-levels-recorded-overnight-lineage-warehouse-fire-boyle-heights/19365593/.

employees, partners, and the communities in which we live and operate." However, as of the date of the filing of this Consolidated Class Action Complaint, Lineage insists there has been no release of hazardous materials and no ammonia leak. Meanwhile, the air quality data described above reflect hazardous conditions in the surrounding community. Furthermore, public health data reveals that emergency room visits in the area surged between June 17 and June 25, 2026.[27]

106. On October 6, 2026, investigators with the California Department of Toxic Substances Control's Criminal Investigations Bureau, assisted by the Los Angeles County District Attorney's Office, served a search warrant at the Facility as part of a criminal investigation. In responding to that search, Lineage stated publicly that it does not store hazardous materials or chemicals at the Facility[28] — notwithstanding that the Facility's refrigeration system used large quantities of anhydrous ammonia, a federally designated extremely hazardous substance. The Los Angeles City Attorney's Office has also confirmed that it opened an investigation of the Fire in early July 2026.[29]

**I. The Aftermath: Rotting Food, Noxious Odors, and Pest Infestation**

107. The harm caused by the Fire did not end when the flames were extinguished, but rather persisted for months. At the time of the Fire, the Facility held approximately 85 to 88 million pounds of frozen food, including meat, poultry, seafood, and other perishable products. The Fire and firefighting efforts destroyed the

---

[27] *See* Sid Garcia, *ER visits spiked around Boyle Heights during warehouse fire, public health data shows*, ABC7 Eyewitness News (Jun. 30, 2026), https://abc7.com/story/er-visits-spiked-around-boyle-heights-during-warehouse-fire-public-health-data-shows/19424801/.

[28] Salvador Hernandez, *Lineage warehouse in Boyle Heights is searched in criminal probe, officials say*, L.A. TIMES (Oct. 6, 2026), available at https://www.latimes.com/california/story/2026-10-06/lineage-warehouse-criminal-investigation.

[29] Christopher Damien & Laura Anaya-Morga, *What was in the air after the Lineage fire? New lawsuits are demanding information*, LAIST (Oct. 7, 2026), available at https://laist.com/news/health/what-was-in-the-air-after-lineage-fire-lawsuits.

Facility's refrigeration capabilities. 85 million pounds of food rotted coupled with the smell of burnt plastic, rubber, and chemicals generated an overwhelming stench of rot that spread across the surrounding residential and commercial neighborhoods and persisted for months.

108. On information and belief, the decomposing food drew swarms of flies, rodents, and other vermin and scavenging animals to the Facility and the surrounding area, creating a pervasive pest infestation and public-health hazard throughout the broader community that persists to the date of this filing. Residents have been forced to keep windows and doors shut against the smell and the pests for months, have been unable to use their yards, patios, and other outdoor spaces, and have endured nausea, loss of appetite, sleep disruption, and a profound loss of the use and enjoyment of their homes. Businesses in the surrounding area, including food-service and other customer-facing businesses, lost patronage and were unable to operate normally in the face of the odor and infestation.

109. On information and belief, the removal of the rotting food and the resulting contamination was a massive, months-long undertaking that required specialized remediation personnel, disinfection, deodorization, perimeter and internal misting systems, continuous odor and air monitoring, pest control, and the offsite hauling and disposal of tens of millions of pounds of decomposed food and debris in water-tight trailers and containers. The noxious odors, the infestation of rodents and other vermin, and the attendant interference with daily life persisted long after the Fire was extinguished and constitute a continuing and substantial harm to Plaintiffs and the Classes — and, for many Class members, among the most significant harms the Fire caused.

110. The scale of the aftermath drew direct government intervention. On information and belief, the Mayor of Los Angeles ordered Defendants to remove all of the approximately 85 million pounds of spoiled food waste from the Facility within 45 days, and, on or about July 1, 2026, the City launched mobile health clinics near

Boyle Heights offering respiratory screenings, oxygen-level and blood-pressure checks, asthma and breathing assessments, eye and skin irritation evaluations, smoke-exposure education, and mental-health support to affected residents.

111. On or about July 4, 2026, the Mayor of Los Angeles sent Lineage a letter imploring it to provide temporary and long-term housing for displaced residents, to fund community health resources, and to furnish a detailed air-quality plan governing the demolition and hauling of debris.

**J. Water and Environmental Contamination Downwind and Downstream of the Facility**

112. The Fire also contaminated the water, soil, and environment downwind and downstream of the Facility, including the Los Angeles River watershed. On information and belief, independent scientific and community studies conducted in the days and weeks after the Fire documented elevated levels of bacteria, heavy metals, and per- and polyfluoroalkyl substances ("PFAS") in water and dust samples collected downwind and downstream of the Facility.

113. On information and belief, Heal the Bay, a watershed-health nonprofit organization, conducted a study of the recreational water quality of the Los Angeles River downstream of the Facility. In the days after the Fire, Heal the Bay tested downstream samples for contaminants including Total Coliform, E. coli, and Enterococcus, and found that its downstream samples were at the maximum detectable levels for each of those measurements. Both turbidity and bacteria levels spiked during the Fire and declined afterward, but bacteria levels have remained unsafe for human contact, and Heal the Bay has advised the public to avoid contact with water in the Lower Los Angeles River watershed.

114. On information and belief, researchers at the University of California, Los Angeles ("UCLA") collected dust and water samples to investigate heavy-metal and PFAS contamination following the Fire. The researchers identified potential sources of the contamination, including the Facility's solar systems, structural steel

and roofing, industrial equipment, paints, refrigeration equipment, insulation, stored materials, and firefighting agents. They found elevated levels of cobalt, cadmium, PFOA, and PFDA in dust collected downwind of the Fire, and found that lead, arsenic, and chromium were elevated in water samples as compared to background levels.30

115. On information and belief, additional UCLA researchers analyzed further water samples collected by community members and compared the average measured concentrations to the historical maximum recorded concentrations for several contaminants. They found that chromium was approximately 2.4 times higher, lead approximately 2.4 times higher, iron approximately 23 times higher, and zinc approximately 11 times higher than previously recorded. These comparisons, together with the accompanying infographic, are set forth in the researchers' published StoryMap.[31]

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

**Plaintiff Ruben Hernandez**

116. Plaintiff Hernandez resides with his wife, two sons, his adult son's girlfriend, and their three dogs in East Los Angeles, just a few blocks east of the Facility. On June 17, 2026, and again on June 18, 2026, Plaintiff Hernandez and his family were ordered to shelter in place. During the shelter-in-place, and throughout the efforts to extinguish the Fire and remediate the Facility, Plaintiff Hernandez and his family suffered health issues relating to the toxic smoke, the continuing flare-ups, and the air quality problems resulting from the Fire, including headaches, ongoing coughing, and irritated and burning eyes.

117. The smell from the Facility also disrupted the family's sleep for months. Plaintiff Hernandez found the smell worst at night, when it seemed to settle in the air. As he struggled to sleep, the smell became so bad that he could taste it, intensifying

---

[30] https://storymaps.arcgis.com/stories/c9a016e562b94ab580c6f91911e7716d (last visited October 8, 2026).

[31] *Id.*

his headaches.

118. Plaintiff Hernandez's younger son suffered worsening asthma due to the Fire and the smell emanating from the Facility. As a result, he was unable to practice baseball, a sport he ordinarily enjoys.

119. Plaintiff Hernandez's older son lives with his girlfriend in an accessory dwelling unit on Plaintiff Hernandez's property. Because of the air quality and the smell, they were unable to use their air conditioning, and spiking summer temperatures made their home especially uncomfortable.

120. Plaintiff Hernandez is self-employed, selling tacos in the neighborhood and at local events. He was unable to work after the Fire started and has been unable to restart the business. Plaintiff Hernandez's property has been plagued with an infestation of large flies that began following the stench and that persists as of the date of this filing.

121. Plaintiff Hernandez's wife works from home two days per week. On her remote workdays, she experienced headaches and found it difficult to focus because of the air quality and the smell of rotting food and burned chemicals.

122. Plaintiff Hernandez also feared the effects the toxic smoke and smell would have on his three dogs, whom he had to take outside for walks regardless of the air quality warnings during and after the Fire.

123. As a result of the Fire, Plaintiff Hernandez suffered damages, including but not limited to loss of the use and enjoyment of his home, economic loss, physical pain and discomfort, disruption and inconvenience, fear, and interference with his property rights.

**Plaintiff Liliana Lozano**

124. Plaintiff Lozano and her family reside in East Los Angeles, just a few blocks from the Facility. On June 17, 2026, and again on June 18, 2026, Plaintiff Lozano and her family were ordered to shelter in place. Since shortly after the Fire began, during the shelter-in-place, and throughout the efforts to extinguish the Fire

and remediate the Facility, Plaintiff Lozano and her family suffered health issues relating to the toxic smoke, the continuing flare-ups, and the air quality problems resulting from the Fire.

125. Shortly after the Fire began, Plaintiff Lozano and her six-year-old daughter began to smell smoke mixed with burning chemicals and melting plastic. Despite the heat, Plaintiff Lozano kept her windows and doors closed and the air conditioning off, as instructed by local officials. Within hours, Plaintiff Lozano had a headache and sore throat and began having difficulty breathing.

126. The next morning, Plaintiff Lozano and her daughter felt much worse. Her daughter woke up with a fever, and Plaintiff Lozano experienced tightness in her chest and shortness of breath; she felt lightheaded and experienced brain fog. As a result of their worsening physical symptoms from the toxic smoke, Plaintiff Lozano had no choice but to leave her home to stay with her mother, and she sent her daughter to stay with her brother. Her brother's home was not far enough from the smoke, however, and her daughter's health deteriorated. On June 23, 2026, Plaintiff Lozano brought her daughter to the children's hospital in Hollywood for emergency medical attention.

127. Plaintiff Lozano works as a street vendor in the East Los Angeles and Boyle Heights neighborhoods. As a result of the shelter-in-place orders, her evacuation, and the air quality and pest problems resulting from the Fire and its aftermath, Plaintiff Lozano was unable to operate her business, lost business income, and was unable to pay her rent. As of the filing of this Consolidated Class Action Complaint, Plaintiff Lozano has not returned to street vending, because of the continuing fly infestation in the neighborhood surrounding the Facility and the emotional distress caused by the Fire and its aftermath.

128. As a result of the Fire, Plaintiff Lozano suffered damages, including but not limited to loss of the use and enjoyment of her home, loss of access to and use of her business, lost business income, physical pain and discomfort, fear, disruption and

inconvenience, and interference with her property rights.

**Plaintiff John Garcia**

129. Plaintiff Garcia lives with his wife, two daughters, and one son in East Los Angeles, near the Facility. On June 17, 2026, and again on June 18, 2026, Plaintiff Garcia and his family were ordered to shelter in place.

130. During the Fire, Plaintiff Garcia and his family were deeply troubled by the smoke, which smelled mechanical and like burning rubber. The smell woke Plaintiff Garcia and his wife from their sleep at night, and his wife often found herself unable to fall back asleep.

131. Plaintiff Garcia and his family suffered health issues as a result of the Fire and the toxic fumes emanating from the Facility. Plaintiff Garcia had recently had cataract surgery and uses eye drops daily; the Fire caused him to suffer increased eye irritation, burning eyes, and a persistent cough. Plaintiff Garcia has an adult daughter with cerebral palsy, and both of his daughters and his wife have asthma. Their health worsened because of the Fire, requiring use of their inhalers, and they also experienced burning eyes and a persistent cough. Plaintiff Garcia's wife suffered from headaches after the Fire began.

132. The smell of rotting food and burned chemicals plagued Plaintiff Garcia and his family for months. In early July 2026, Plaintiff Garcia sent his daughters to stay with his sister to escape the smell. Plaintiff Garcia, who has lived in the neighborhood for more than six decades, was unable to relocate because of his work and the costs of relocating.

133. Plaintiff Garcia's home became increasingly hot and uncomfortable because he was unable to use his window air conditioning units, and he opened the windows only at night because it was too hot to sleep. Ordinarily, during the warmer months, Plaintiff Garcia and his family eat dinner outside, where it is often cooler than inside the house; they were unable to use and enjoy their outdoor space after the Fire started. Plaintiff Garcia tried to limit his family's exposure to the toxic smoke, fumes,

and smell, but he had to take his two dogs outside regardless of the air quality; he tried to do so only when the wind shifted away from his yard, but that was not always possible. Plaintiff Garcia's yard has become infested with large flies. He purchases industrial fly traps that must be replaced every two or three days. He can no longer enjoy this outdoor space.

134. As a result of the Fire, Plaintiff Garcia suffered damages, including but not limited to loss of the use and enjoyment of his home, physical pain and discomfort, fear, disruption and inconvenience, and interference with his property rights.

**Plaintiff Anthony Hale**

135. Plaintiff Hale and his family reside in the Boyle Heights neighborhood, just a few blocks from the Facility. On June 17, 2026, and again on June 18, 2026, Plaintiff Hale and his family were ordered to shelter in place.

136. On the afternoon the Fire broke out, Plaintiff Hale was at home with his two children and their mother. Plaintiff Hale's son has asthma, as does the children's mother. Even before Plaintiff Hale learned about the Fire, his son began experiencing difficulty breathing. Plaintiff Hale set him up with a breathing treatment and stepped outside onto the porch, where the smell of burning chemicals and smoke overwhelmed him. It was then that Plaintiff Hale saw that there was a fire at the warehouse.

137. Plaintiff Hale is a retired truck driver who used to pick up deliveries from the Facility and deliver them across the country, and he was aware of the kinds of materials used at the Facility, including ammonia, fiberglass, and plastics. As he watched the black plume of smoke and smelled the burning chemicals, Plaintiff Hale feared for his family's health. He called 311 for advice and was instructed to keep his windows and doors closed, keep his air conditioning off, and remain inside. For the next four days, the family suffered through the heat and remained inside. Plaintiff Hale kept his children home from summer school and ultimately unenrolled them from the program out of deep concern for their health.

138. During the shelter-in-place, and throughout the efforts to extinguish the

Fire and remediate the Facility, Plaintiff Hale, his children, and their mother suffered health issues as a result of the Fire. Plaintiff Hale's son's asthma worsened, necessitating additional breathing treatments. The children's mother required three different inhalers in addition to saline breathing treatments, and she suffered from pain in her chest. Plaintiff Hale, his daughter, and her mother also experienced headaches from the smoke and smell.

139. When his daughter complained that she could smell the smoke and fumes from inside her bedroom, Plaintiff Hale fled with his family to his sister's house in Moreno Valley for a few days. They returned home because the children's mother has weekly doctor's appointments that she cannot miss. It was not until July 8, 2026 that Plaintiff Hale was able to obtain an air purifier for his home and begin using the air conditioning again.

140. Plaintiff Hale ordinarily sits with the street vendors outside of his apartment, selling various items from his storage unit. He was unable to do so after the Fire began and lost business income as a result, and as of the filing of this Consolidated Class Action Complaint, he has not returned to street vending, because of the continuing fly infestation in the neighborhood surrounding the Facility and the emotional distress caused by the Fire and its aftermath.

141. As a result of the Fire, Plaintiff Hale suffered damages, including but not limited to loss of the use and enjoyment of his home, lost time in school for his children, physical pain and discomfort, fear, disruption and inconvenience, loss of income, including lost business income, and interference with his property rights.

**Plaintiff Yvette Martinez**

142. Plaintiff Martinez and her family reside as tenants in East Los Angeles, near the Facility and inside the area subject to the Fire's evacuation and shelter-in-place orders. On June 17, 2026, Plaintiff Martinez and her household were ordered to evacuate as a result of the Fire and the toxic smoke and substances emanating from the Facility.

143. From the day the Fire began through late August 2026, an extremely strong and unbearable smoke odor filled Plaintiff Martinez's home. She was unable to open her windows or use her air conditioning, and her children were deprived of the ability to play outside. Plaintiff Martinez and her family suffered nausea and headaches, and the household endured a pest infestation following the Fire.

144. As a result of the Fire, Plaintiff Martinez suffered damages, including but not limited to loss of the use and enjoyment of her home, physical pain and discomfort, fear, disruption and inconvenience, and interference with her property rights.

**Plaintiff Citlali Guardado**

145. Plaintiff Guardado resides with her family in East Los Angeles, inside the area subject to the shelter-in-place orders issued in connection with the Fire. On June 17, 2026, and again on June 18, 2026, Plaintiff Guardado and her family sheltered in place.

146. From the first day of the Fire and for months afterward, the odor was too strong for the family to be outdoors. Ash and residue coated the family's home and vehicles. During a heatwave, the family could not use their air conditioning without drawing the smell indoors, the household pets could not go outside, and the trash cans and surrounding areas became infested with flies.

147. As a result of the Fire, Plaintiff Guardado suffered damages, including but not limited to loss of the use and enjoyment of her home, physical pain and discomfort, fear, disruption and inconvenience, and interference with her property rights.

**Plaintiff Luis Guardado**

148. Plaintiff Guardado and his family reside as tenants in East Los Angeles, near the Facility and inside the shelter-in-place zone. On June 17, 2026, and again on June 18, 2026, Plaintiff Guardado and his family were ordered to shelter in place.

149. For approximately one to two months following the Fire, a horrible odor pervaded the neighborhood. Plaintiff Guardado and his family had difficulty breathing

outdoors and suffered constant headaches and nausea, and his three-year-old child became sick each time the child went outside, causing Plaintiff Guardado significant anxiety for his family's health and safety. The household also endured a pest infestation following the Fire.

150. As a result of the Fire, Plaintiff Guardado suffered damages, including but not limited to loss of the use and enjoyment of his home, physical pain and discomfort, fear, disruption and inconvenience, and interference with his property rights.

**Plaintiff Vanessa Reyes**

151. Plaintiff Reyes resides as a tenant in the Boyle Heights neighborhood, near the Facility and inside the shelter-in-place zone. On June 17, 2026, and again on June 18, 2026, Plaintiff Reyes was ordered to shelter in place.

152. On June 17, 2026, Plaintiff Reyes smelled the Fire; the next day, a grey cloud and haze settled over her residence, obscuring her view of downtown, and ash covered her balcony and plants. She kept her windows shut and relied on her air conditioning but could still smell the aftermath. Plaintiff Reyes developed throat irritation, a persistent cough, an unpleasant taste in her mouth, and dry, itchy eyes that persisted for approximately three months, and she was unable to leave her home — all while facing a surgery scheduled for June 22, 2026. She consulted a physician and purchased over-the-counter remedies to treat her cough, and incurred increased air-conditioning costs. The household also endured a pest infestation following the Fire.

153. As a result of the Fire, Plaintiff Reyes suffered damages, including but not limited to loss of the use and enjoyment of her home, physical pain and discomfort, fear, disruption and inconvenience, and interference with her property rights.

**Business Plaintiffs**

**Ortegati, Inc.**

154. Plaintiff Ortegati, Inc. owns and operates an automobile repair shop located at 1801 South Pembroke Lane, Los Angeles, California, within the area

subject to the SCAQMD particle-pollution advisory issued in connection with the Fire. Its president is Braulio Ortega.

155. As a result of the Fire, Plaintiff Ortegati, Inc. was forced to close its shop because of the smoke and odor, and its business remained slow for days after it reopened. Smoke and combustion residue were deposited on approximately ten vehicles at the shop — some owned by the business and some owned by its customers — causing paint damage, as documented by photographs.

156. As a result of the Fire, Plaintiff Ortegati, Inc. suffered damages, including but not limited to physical damage to and contamination of its business property and customer vehicles, business interruption, lost business income, disruption and inconvenience, and related economic loss.

**Mexes Café, LLC**

157. Plaintiff Mexes Cafe, LLC is a California limited liability company that owns and operates a café located at 710 North Eastern Avenue, Los Angeles, California 90022, within the geographic area subject to the shelter-in-place order and/or the SCAQMD particle pollution advisory issued in connection with the Fire.

158. Beginning on the day the Fire broke out, Mexes Café was affected by the smoke and odor from the Fire and was unable to operate normally, suffering a substantial financial loss over the months that followed.

159. As a result of the Fire, Plaintiff Mexes Cafe, LLC suffered damages, including but not limited to loss of business income, business interruption, disruption and inconvenience, and related economic loss.

## CLASS ACTION ALLEGATIONS

160. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), and seek certification of the following Classes:

**Resident Class:** All natural persons who, at any time during the Class Period, resided in, owned, or occupied real property within the Class Area, were

exposed to smoke, toxic fumes, ash, vermin infestations, noxious fumes and odors, and/or particulate matter, or who were subject to the shelter-in-place orders and/or air quality warnings issued, as a result of the Fire.

**Business Class:** All persons and business entities (including sole proprietors and street vendors), the incorporated businesses, and the owners of unincorporated businesses at any time during the Class Period within the Class Area that suffered business interruption, lost revenue, closure, damage to property, and/or related economic loss as a result of the Fire and the associated emergency-response measures.

(Each, a "Class", and collectively, the "Classes.")

**"Class Period"** means the period from June 17, 2026 through the date the Fire and its resulting condition, including smoke, noxious particulate and odors, toxic fumes, ash, vermin infestations, were fully abated.

**"Class Area"** means the geographic area affected by the Fire and the smoke, ash, particulate matter, and noxious odors it caused — including odors from the decomposition of stored food resulting from the loss of refrigeration at the Facility — as that area is (a) identified in the official advisories, warnings, and guidance issued by public-safety and/or public-health agencies in response to the Fire and its aftermath, and (b) confirmed and delineated by concrete geographic boundaries (identified streets, map coordinates, ZIP codes, or census tracts) through plume-dispersion and odor-dispersion modeling.

161. Excluded from the Class are Defendants and their subsidiaries and affiliates, Defendants' executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, and their immediate families.

162. Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or division into other subclasses after Plaintiffs have an opportunity to conduct discovery. Additionally, the hazardous materials are subject to revision based upon information learned through the discovery process.

163. **Numerosity (Fed. R. Civ. P. 23(a)(1)).** The Resident Class and Business Class each consist of many thousands of individuals and business entities; on information and belief, the geographic area affected by the Fire encompasses more than 100,000 residents, workers, and businesses. The SCAQMD advisory area and the shelter-in-place zone span a significant portion of Boyle Heights and the surrounding communities, encompassing a population far too numerous for joinder of all members to be practicable. The precise number of Class members is presently unknown to Plaintiffs but is ascertainable through government records, utility and business-license records, and other means.

164. **Commonality (Fed. R. Civ. P. 23(a)(2)).** Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members, including, without limitation: (a) whether Defendants were negligent with respect to the rooftop solar array reconfiguration, testing, and commissioning work and the resulting Fire; (b) whether Defendants breached their respective duties as premises owner, tenant-operator, solar array owner/operator, solar contractor, and/or component designer, manufacturer, or supplier; (c) whether Defendants violated statutes, ordinances, or regulations designed to prevent fires or hazardous releases such that they are negligent per se; (d) whether Defendants' conduct caused the release of toxic smoke, ash, soot, airborne particulate matter, accelerants, and other hazardous toxins and combustion byproducts, including anhydrous ammonia and hydrogen fluoride; (e) whether the physical intrusion of those substances onto Class members' properties constitutes trespass; (f) whether Defendants' conduct constituted private and/or public nuisance; (g) whether Defendants' storage and use of large quantities of hazardous, flammable, and toxic materials and accelerants at the Facility constitutes an ultrahazardous activity; (h) whether the 2024 Fire placed Defendants on notice of the hazard that caused the Fire; (i) the geographic scope of the area affected by the Fire; (j) the nature, concentration, and health effects of the toxic substances released; (k) whether Business Class

members were required to cease or curtail operations as a result of Defendants' conduct and the shelter-in-place order and/or SCAQMD advisories; (l) whether the Fire and the destruction of the Facility's refrigeration capacity caused the decomposition of approximately 85 to 88 million pounds of stored food, resulting in noxious odors and pest infestation constituting a nuisance to the surrounding community; (m) whether the Fire caused contamination of the air, water, soil, and surrounding environment downwind and downstream of the Facility, including the Los Angeles River watershed; and (n) the appropriate measure of damages.

165. **Typicality (Fed. R. Civ. P. 23(a)(3)).** Plaintiffs Hernandez, Lozano, Garcia, and Hale's claims are typical of the claims of other Resident Class members, and Plaintiffs Lozano and Hale's claims are typical of the claims of other Business Class members, as all such claims arise from the same events and the same course of conduct by Defendants, and are based on the same legal theories.

166. **Adequacy (Fed. R. Civ. P. 23(a)(4)).** Plaintiffs will fairly and adequately represent and protect the interests of their respective Classes. Plaintiffs have no interests antagonistic to those of other Class members. This action is co-led by McCune Law Group, APC and Ahdoot & Wolfson, PC, together with a Plaintiffs' Steering Committee of counsels experienced in complex environmental and mass-tort class litigation. Counsels are competent and will prosecute this action vigorously on behalf of the Classes.

167. **Predominance and Superiority (Fed. R. Civ. P. 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual Class members. Defendants' conduct, the toxic releases caused by the Fire, and the geographic scope of the Fire's impact are each susceptible to common proof through air quality data, regulatory records, LAFD measurements, expert plume modeling, and property and business-interruption records. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual Class members' damages, standing alone, may be insufficient to justify the expense

and burden of individual litigation, and the interests of judicial economy strongly favor resolving the common questions presented by this consolidated action in a single proceeding.

168. **Injunctive and Declaratory Relief.** Defendants' unlawful conduct is uniform as to all members of the Class and constitutes an ongoing harm. Defendants acted or refused to act on grounds that apply generally to the Class, so that final injunctive or declaratory relief is appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION — Negligence (Against All Defendants)

169. Plaintiffs incorporate by reference each and every allegation set forth above as though fully alleged herein.

170. Defendant Chill Build, as owner of the Facility, owed a duty of reasonable care to maintain the premises safely and to ensure that activity it permitted on the premises, including contractor activity on the roof, did not create an unreasonable risk of fire. Defendant Lineage, as tenant-operator, owed a duty of reasonable care to safely operate the Facility, to oversee contractor and subcontractor activity on property within its control, to exercise with reasonable care the safety oversight it retained and exercised over the work on the rooftop solar array, and to prevent the release of hazardous substances from the Facility.

171. Defendants Altus Power and Los Palos, as owners and operators of the rooftop solar array, owed a duty of reasonable care to maintain the array safely, to properly supervise and control the Re-Configuration Project and any contractor performing work on the array, and to ensure that testing, commissioning, and energization of the array did not create an unreasonable risk of fire. Defendant Pearce, as the contractor retained to perform reconfiguration, testing, and commissioning work on the array, owed a duty to perform that work with the care and skill of a reasonably competent solar services contractor and to take reasonable measures to prevent ignition during testing and commissioning.

172. Defendants NEP, Hyundai, and Amphenol, as designers, manufacturers, and/or suppliers of components installed in the rooftop solar array — including the rapid-shutdown devices and transmitters supplied by NEP, the solar modules supplied by Hyundai, and the electrical connectors supplied by Amphenol — each owed a duty of reasonable care to design, manufacture, and supply components that were non-defective and compatible with the other components with which they were intended to be used, and to warn of known risks associated with their use.

173. Defendants Chill Build and Lineage breached their respective duties by, among other things: (a) failing to implement adequate fire-prevention measures during high-risk testing and reconfiguration activity on an active industrial facility; (b) failing to ensure that such testing could be performed safely given the presence of a refrigerant system, lithium-ion batteries, a high-energy solar installation, and combustible polyurethane foam insulation; (c) failing to have adequate fire-suppression systems operational during the testing and commissioning work; (d) failing to coordinate with co-contractors regarding fire risk; (e) failing to investigate and remediate the risk identified by the 2024 Fire; and (f) failing to prevent the escape of toxic smoke, ash, soot, accelerants, hydrogen fluoride, and other hazardous substances from the Facility. Lineage further breached its duties by failing to exercise the safety oversight it retained over the solar array work with reasonable care, including by failing to require that the array remain de-energized until the safety testing and walk-through for which its own supervisor was responsible had been completed, failing to monitor whether the array was being energized, and permitting Pearce to work on the roof of an operating cold-storage facility without adequate fire-watch personnel or fire-suppression equipment.

174. Defendants Altus Power and Los Palos breached their respective duties by, among other things: (a) failing to maintain the solar array safely; (b) failing to ensure the Re-Configuration Project was performed safely and in accordance with applicable specifications and codes; (c) approving, sourcing, or providing rapid-

shutdown devices with connectors that were incompatible with the solar panel connectors, thereby requiring the use of thousands of jumper connections and greatly increasing the likelihood of a poor connection that could lead to ignition; (d) authorizing Pearce to commence testing, commissioning, and energization of the array before required safety testing had been completed; (e) authorizing energization of the array before the full-system, pre-operation walk-through that Lineage had requested; (f) failing to adequately control and supervise Pearce's work; and (g) failing to heed the fire risk identified nearly two years earlier in connection with the 2024 Fire.

175. Defendant Pearce breached its duty by, among other things: (a) failing to perform its reconfiguration, testing, and commissioning work safely and competently; (b) failing to adequately inspect, test, and verify rapid-shutdown devices, connectors, wire management, combiner panels, inverters, and related electrical components before testing and energization; (c) using thousands of jumper connections, including connectors from multiple incompatible brands, in a manner that materially increased the likelihood of ignition; (d) leaving connector tightening bolts loose or cross-threaded and failing to remediate damaged wiring, each of which created an ignition risk; (e) energizing portions of the array before the full-system safety walk-through Lineage had requested; and (f) failing to implement adequate fire-prevention measures during testing and commissioning on an active cold-storage facility.

176. On information and belief, Defendants NEP, Hyundai, and Amphenol each breached their respective duties by designing, manufacturing, and/or supplying components that were defective and/or incompatible with the other components installed in the array, and that created an unreasonable risk of ignition — including the rapid-shutdown devices and transmitters bearing duplicate identification numbers supplied by NEP, the solar modules supplied by Hyundai, and the electrical connectors supplied by Amphenol, including the Amphenol connectors used on the Hyundai modules.

177. In the alternative, as to Chill Build, Lineage, Altus Power, Los Palos, and

Pearce only, the fire is of a kind that ordinarily does not occur without negligence, the rooftop array and the testing then underway were in the control of those defendants, and Plaintiffs did not contribute to it. Plaintiffs are entitled to an inference of negligence under res ipsa loquitur against those defendants. This allegation is not made against NEP.

178. As a direct and proximate result of Defendants' negligence, Plaintiffs and the Classes suffered damages, including property damage, loss of use and enjoyment of property, diminution in property value, physical and other health impacts from exposure to toxic smoke, ash, soot, airborne particulate matter, accelerants, and other hazardous toxins and combustion byproducts — including headaches, coughing, burning and irritated eyes, sore throat, chest tightness, shortness of breath, dizziness and "brain fog," and the exacerbation of asthma and other respiratory conditions in adults and children, some requiring emergency and hospital care — displacement and relocation expenses, business interruption and other economic losses, harm from the pervasive noxious odors and pest infestation caused by the decomposition of the Facility's stored food, contamination of water, soil, and the surrounding environment downwind and downstream of the Facility, and emotional distress, all in amounts to be proven at trial.

**SECOND CAUSE OF ACTION — Negligence Per Se (Against All Defendants)**

179. Plaintiffs incorporate by reference each and every allegation set forth above as though fully alleged herein.

180. California Evidence Code § 669 creates a rebuttable presumption of negligence where a person violates a statute, ordinance, or regulation; the violation proximately causes injury; the injury resulted from an occurrence of the nature the statute, ordinance, or regulation was designed to prevent; and the plaintiff was a member of the class of persons for whose protection the statute, ordinance, or regulation was adopted. See *Ramirez v. Nelson,* 44 Cal. 4th 908, 918 (2008).

181. Defendants violated numerous statutes, ordinances, and regulations

applicable to the regulated and hazardous substances and materials handled at the Facility, including: (a) the California Fire Code; (b) the California Accidental Release Prevention Program, Health & Safety Code §§ 25531-25543.3 and Title 19 of the California Code of Regulations, which require risk-management and accidental-release-prevention programs for facilities handling regulated substances, including the anhydrous ammonia used in the Facility's industrial refrigeration system, above threshold quantities; (c) the Hazardous Materials Business Plan requirements, Health & Safety Code §§ 25500-25520; (d) the Cal/OSHA General Duty Clause and General Industry Safety Orders, Labor Code § 6400 and Title 8 of the California Code of Regulations §§ 3200 et seq.; and (e) applicable building, electrical, and fire-code permitting and inspection requirements, which, on information and belief, Defendants violated by performing major electrical reconfiguration, testing, and energization work on the rooftop solar array without obtaining the permits and inspections those codes require.

182. These statutes, ordinances, and regulations were enacted to protect persons such as Plaintiffs and the Classes from the precise type of harm that occurred here: an industrial fire and the resulting release of toxic smoke, accelerants, and hazardous combustion byproducts, including hydrogen fluoride. The 2024 Fire gave Defendants actual notice of the hazard that these statutes, ordinances, and regulations were designed to prevent.

183. Defendants' violations of these statutes, ordinances, and regulations were a direct, legal, and proximate cause of the Fire and of Plaintiffs' and the Classes' resulting injuries and damages, rendering Defendants negligent as a matter of law pursuant to Evidence Code § 669.

**THIRD CAUSE OF ACTION — Premises Liability (Against Chill Build Los Angeles I, LLC and Lineage Only)**

184. Plaintiffs incorporate by reference each and every allegation set forth above as though fully alleged herein.

185. Defendant Chill Build, as owner, and Defendant Lineage, as the tenant in possession and control of the Facility, each owed a duty of reasonable care to Plaintiffs and the Classes as persons foreseeably harmed by unsafe conditions on the Facility premises, including persons and businesses located off the premises. See *Kesner v. Superior Court*, 1 Cal. 5th 1132 (2016).

186. Chill Build and Lineage knew or should have known of the fire hazard created by the combination of rooftop solar testing and reconfiguration activity, the Facility's refrigeration system, lithium-ion battery-powered equipment, and dense polyurethane foam insulation — particularly given the 2024 Fire at the same location involving the same solar installation, and given the documented, unresolved connector-failure and incompatible-component issues identified in the array in the months leading up to the Fire.

187. Chill Build and Lineage failed to take reasonable measures to address this known risk, including by failing to ensure adequate fire-suppression systems were in place, failing to require or confirm implementation of required fire-safety precautions during the testing and commissioning work underway at the time of the Fire, and failing to remediate the hazards identified by the 2024 Fire and the subsequent connector and component issues.

188. As a direct and proximate result of Chill Build's and Lineage's breaches of their duties as premises owner and occupier, Plaintiffs and the Classes suffered the damages alleged herein.

**FOURTH CAUSE OF ACTION — Trespass (Against All Defendants)**

189. Plaintiffs incorporate by reference each and every allegation set forth above as though fully alleged herein.

190. Plaintiffs and the Classes are owners and/or lawful occupants of real property, including residential and business premises, located within the geographic area affected by the Fire.

191. Defendants' negligent and/or reckless conduct, as alleged herein, caused

the physical intrusion of toxic and harmful substances — including hydrogen fluoride, toxins, accelerants, polyurethane combustion byproducts, gases generated by the decomposition of the Facility's stored food, soot, fine particulate matter, heavy metals, per- and polyfluoroalkyl substances (PFAS), and other hazardous substances — onto Plaintiffs' and the Classes' real property without their consent.

192. Under California law, a physical invasion of real property by smoke, soot, particulate matter, and chemical compounds constitutes a trespass. See *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 936 (1996); *Mangini v. Aerojet-General Corp.*, 230 Cal. App. 3d 1125 (1991). The intrusion of soot, ash, particulate matter, and other combustion byproducts onto Class members' properties, as reflected in SCAQMD advisories and air monitoring data, constitutes a particulate invasion beyond mere nuisance sufficient to support a claim for trespass.

193. As a direct and proximate result of Defendants' trespass, Plaintiffs and the Classes suffered physical contamination of their properties, loss of use and enjoyment of property, diminution in property value, and related harm.

**FIFTH CAUSE OF ACTION — Private Nuisance (Against All Defendants)**

194. Plaintiffs incorporate by reference each and every allegation set forth above as though fully alleged herein.

195. Defendants' conduct in causing or permitting the release of toxic smoke, gases, accelerants, and particulate matter from the Facility constituted a substantial and unreasonable interference with Plaintiffs' and the Classes' use and enjoyment of their properties, in violation of California Civil Code §§ 3479 and 3480.

196. The interference was substantial, causing actual harm in the form of toxic chemical exposure, property contamination, pervasive noxious odors from the decomposition of tens of millions of pounds of stored food, infestation by rodents and other vermin, loss of use, disruption of daily activities and business operations, physical symptoms, and the inability of residents to open their windows, run their air conditioning, or use their yards and outdoor spaces during the summer heat, and was

unreasonable, exceeding the level of inconvenience ordinarily attributable to neighboring industrial land use.

197. Plaintiffs and the Classes did not consent to this interference, and the harm was not a necessary consequence of any lawful activity conducted by Defendants. As a direct and proximate result of Defendants' private nuisance, Plaintiffs and the Classes suffered the damages alleged herein.

**SIXTH CAUSE OF ACTION — Public Nuisance (Against All Defendants)**

198. Plaintiffs incorporate by reference each and every allegation set forth above as though fully alleged herein.

199. Defendants' conduct unreasonably interfered with rights common to the public at large — including the right to breathe clean air, to use public spaces, streets, and waterways (including the Los Angeles River and the Lower Los Angeles River watershed), and to inhabit and operate homes and businesses free from hazardous chemical contamination, noxious odors, and pest infestation — across an area encompassing millions of residents in multiple counties, in violation of California Civil Code §§ 3479 and 3480.

200. This interference affected a substantial and discrete portion of the public. The Governor of California, the City of Los Angeles, and the County of Los Angeles each declared states of emergency in recognition of the widespread public harm caused by the Fire.

201. The hazardous conditions created by Defendants resulted in widespread emergency response measures, including unprecedented helicopter water drops, the opening of emergency shelters and medical facilities, shelter-in-place orders, road closures, emergency perimeters, hazardous-materials response operations, and public safety warnings, and caused substantial disruption to residential neighborhoods and surrounding communities in Boyle Heights and East Los Angeles and significant air quality impacts across the broader region, including Downey, West Hollywood, and Compton.

202. Plaintiffs suffered special injury different in kind from the general public, consisting of ash, soot, or odor deposited on a specific residence or business and, for the business classes, closure of that premises. Plaintiffs' and Class members' injuries were also different in kind from those suffered by the general public because they resided or operated businesses in the shelter-in-place zone or the Class Area, suffered direct interference with the use and enjoyment of their homes and properties, incurred shelter-in-place and displacement-related expenses, and experienced health problems and heightened contamination concerns, fear, annoyance, inconvenience, and property-related damages.

**SEVENTH CAUSE OF ACTION — Strict Liability for Ultrahazardous Activity (Against Lineage, Los Palos, Altus Power, and Pearce)**

203. Plaintiffs incorporate by reference each and every allegation set forth above as though fully alleged herein.

204. California recognizes strict liability, without regard to fault, for ultrahazardous or abnormally dangerous activities. See *Luthringer v. Moore, 31 Cal. 2d 489* (1948). Whether an activity is ultrahazardous is a question of law to be determined under the factors set forth in the Restatement (Second) of Torts §§ 519-520.

205. Lineage's storage, handling, and use of large quantities of hazardous, flammable, and toxic materials and accelerants at the Facility — including large quantities of anhydrous ammonia used as an industrial refrigerant and combustible polyurethane foam insulation, beneath a high-energy rooftop solar installation that Lineage leased its roof to host and over whose reconfiguration, testing, and energization Lineage retained and exercised safety oversight — in the midst of a densely populated residential and commercial neighborhood, constitutes an ultrahazardous activity: (a) the industrial-scale storage and use of hazardous, flammable, and toxic materials and accelerants, including pressurized anhydrous ammonia and other refrigerants, in combination with a high-energy solar installation,

presents a high degree of risk of harm if released or ignited, as the June 17, 2026 Fire demonstrated; (b) the harm likely to result from such a release or ignition is great, given the population density of Boyle Heights; (c) the risk cannot be eliminated through the exercise of reasonable care alone, as illustrated by the 2024 Fire and the recurrence of a rooftop ignition event less than two years later notwithstanding the Re-Configuration Project undertaken in the interim; (d) the storage and use of industrial-scale hazardous, flammable, and toxic materials and accelerants in combination with a large-scale solar installation is not a matter of common usage by the public; (e) the location of these materials and equipment — immediately adjacent to homes, schools, and businesses — is inappropriate to the risk posed; and (f) the value to the community of Lineage's cold-storage operation does not outweigh the danger it poses to the health and property of the surrounding population. The anhydrous ammonia used in the Facility's industrial refrigeration system is one such hazardous material among those stored, handled, and used at the Facility.

206. The operation, reconfiguration, testing, and energization of the rooftop solar array by Los Palos, Altus Power, and Pearce likewise constitutes an ultrahazardous activity. The array — approximately 12,400 solar panels covering substantially the entire roof of the Facility (LAFD Report at 8), and one of the largest rooftop solar installations in California — generates high-voltage electricity whenever it is exposed to sunlight, and sits atop an operating cold-storage warehouse containing large quantities of anhydrous ammonia, combustible foam insulation, and tens of millions of pounds of plastic-wrapped food, immediately adjacent to homes, schools, and businesses in a densely populated neighborhood: (a) operating, testing, and energizing such an array on such a building presents a high degree of risk of fire, as the 2024 Fire and the June 17, 2026 Fire demonstrate; (b) the harm likely to result from such a fire is great, given the Facility's contents and the population density of Boyle Heights; (c) the risk cannot be eliminated through the exercise of reasonable care alone, as illustrated by the recurrence of a rooftop ignition event less than two

years after the 2024 Fire notwithstanding the Re-Configuration Project undertaken in the interim; (d) operating and energizing a commercial-scale, high-voltage solar array atop an occupied industrial facility that stores hazardous and combustible materials is not a matter of common usage by the public; (e) the location of the array — on the roof of such a facility, immediately adjacent to homes, schools, and businesses — is inappropriate to the risk posed; and (f) the value of the array to the community does not outweigh the danger that its operation, testing, and energization pose to the health and property of the surrounding population.

207. Lineage, Los Palos, Altus Power, and Pearce are each strictly liable for all harm to Plaintiffs and the Classes proximately caused by their respective ultrahazardous activities described above, regardless of the presence or absence of negligence. As a direct and proximate result, Plaintiffs and the Classes suffered the damages alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully request that this Court:

1. Certify this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), 23(b)(2), and/or 23(c)(4); designate Plaintiffs Ruben Hernandez, Liliana Lozano, John Garcia, Anthony Hale, Yvette Martinez, Citlali Guardado, Luis Guardado, and Vanessa Reyes as Class Representatives for the Resident Class; designate Plaintiffs Ortegati, Inc. and Mexes Café, LLC as Class Representatives for the Business Class; and appoint Plaintiffs' counsel as Class Counsel;
2. Enter judgment against all Defendants for compensatory damages, including: (a) physical damage to property from chemical deposition, soot, and toxic particulates; (b) costs of investigation, testing, and remediation of property contamination; (c) diminution in property value; (d) loss of use and enjoyment of property; (e) business interruption, lost income, and other

economic losses; (f) personal injury damages for documented health impacts; (g) damages for the pervasive noxious odors and pest infestation caused by the decomposition of the Facility's stored food; (h) costs of investigation, testing, and remediation of water, soil, and environmental contamination downwind and downstream of the Facility; (i) displacement, relocation, and temporary-housing expenses; (j) damages for lost time at work and school; and (k) medical monitoring;

3. Award punitive damages against each Defendant to the extent permitted by law, including based on Defendants' knowledge of the fire risk demonstrated by the 2024 Fire, Defendants' awareness of the unresolved connector, jumper, and component defects identified in the months preceding the Fire, and Defendants' decision to energize the solar array in direct contradiction of explicit safety requests before required safety testing had been completed;
4. Award injunctive or equitable relief as permitted by law, including: requiring environmental testing and remediation of the area, including contaminated properties, water, and soil within and downwind and downstream of the Class area; a comprehensive environmental study of the Facility and the surrounding community; and such further measures as are necessary to abate the ongoing hazard, up to and including permanent closure of the Facility and cold-storage processes at the site;
5. Award pre- and post-judgment interest at the maximum rate permitted by law;
6. Award reasonable attorneys' fees and litigation costs pursuant to applicable law, including California Code of Civil Procedure § 1021.5 (private attorney general doctrine); and
7. Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

DATED: October 13, 2026

Respectfully submitted,

**MCCUNE LAW GROUP, APC**

By: /s/ *Richard D. McCune*
Michele M. Vercoski
Richard D. McCune
Yasmin N. Younessi

**AHDOOT & WOLFSON, PC**

DATED: October 13, 2026

By: /s/ *Theodore Maya*

Tina Wolfson
Robert R. Ahdoot
Jeff S. Westerman
Theodore Maya

*Interim Co-Lead Class Counsel for Plaintiffs and the Proposed Classes*